## UNITED STATES *v.* MACINTOSH.

No. 504.   Argued April 27, 1931.—Decided May 25, 1931.

606

*Solicitor General Thacher,* with whom *Assistant Attorney General Dodds* and *Messrs. Whitney North Seymour* and *Harry S. Ridgley* were on the brief, for the United States.

608

609

610

*Mr. John W. Davis*, with whom *Messrs. Charles E. Clark, Allen Wardwell*, and *W. Charles Poletti* were on the brief, for respondent.

611

612

*Messrs. Charles P. Howland* and *Richard W. Hale,* by special leave of Court, filed a brief, as *amici curiae.*

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The respondent was born in the Dominion of Canada. He came to the United States in 1916, and in 1925 declared his intention to become a citizen. His petition for naturalization was presented to the federal district court for Connecticut, and that court, after hearing and consideration, denied the application upon the ground that, since petitioner would not promise in advance to bear arms in defense of the United States unless he believed the war to be morally justified, he was not attached to the principles of the Constitution. The Circuit Court of Appeals reversed the decree and directed the district court to admit respondent to citizenship. 42 F. (2d) 845.

The Naturalization Act, § 4, c. 3592, 34 Stat. 596 (U. S. C., Title 8, § 372 *et seq.*), provides that an alien may be admitted to citizenship in the manner therein provided and not otherwise. By § 3 of the same act, jurisdiction to naturalize aliens is conferred upon the district courts of the United States and other enumerated courts of record. U. S. C., Title 8, § 357. The applicant is required to make

and file a preliminary declaration in writing setting forth, among other things, his intention to become a citizen of the United States and to renounce all allegiance to any foreign prince, etc. Section 4 of the act (U. S. C., Title 8, §§ 381, 382) provides:

"Third. He shall, before he is admitted to citizenship, declare on oath in open court that he will support the Constitution of the United States, and that he absolutely and entirely renounces and abjures all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly by name to the prince, potentate, state, or sovereignty of which he was before a citizen or subject; that he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same.

"Fourth. It shall be made to appear to the satisfaction of the court admitting any alien to citizenship that immediately preceding the date of his application he has resided continuously within the United States five years at least, and within the State or Territory where such court is at the time held one year at least, and that during that time he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. In addition to the oath of the applicant, the testimony of at least two witnesses, citizens of the United States, as to the facts of residence, moral character, and attachment to the principles of the Constitution shall be required, . . ."

Section 9 of the act, 34 Stat. 599, (U. S. C., Title 8, § 398), requires that every final hearing upon a petition for naturalization shall be had in open court; that every final order upon the petition shall be under the hand of the court; and that " upon such final hearing of such petition the applicant and witnesses shall be examined under

oath before the court and in the presence of the court." By § 11, 34 Stat. 599 (U. S. C., Title 8, § 399), it is provided that the United States shall have the right to appear in the proceeding for the purpose of cross-examining the petitioner and witnesses produced in support of the petition " concerning any matter touching or in any way affecting his right to admission to citizenship, and shall have the right to call witnesses, produce evidence, and be heard in opposition to the granting of any petition in naturalization proceedings."

By the petition for naturalization a case is presented for the exercise of the judicial power under the Constitution, to which the United States is a proper, and always a possible, adverse party. *Tutun* v. *United States,* 270 U. S. 568, 576–577.

Naturalization is a privilege, to be given, qualified or withheld as Congress may determine, and which the alien may claim as of right only upon compliance with the terms which Congress imposes. That Congress regarded the admission to citizenship as a serious matter is apparent from the conditions and precautions with which it carefully surrounded the subject. Thus, among other provisions, it is required that the applicant not only shall reside continuously within the United States for a period of at least five years immediately preceding his application, but shall make a preliminary declaration of his intention to become a citizen at least two years prior to his admission. He must produce the testimony of witnesses as to the facts of residence, moral character and attachment to the principles of the Constitution, and in open court take an oath renouncing his former allegiance and pledging future allegiance to the United States. At the final hearing in open court, he and his witnesses must be examined under oath, and the government may appear for the purpose of cross-examining in respect of " any matter touching or in any way affecting his right to

admission," introduce countervailing evidence, and be heard in opposition.

In specifically requiring that the court shall be satisfied that the applicant, during his residence in the United States, has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, etc., it is obvious that Congress regarded the *fact* of good character and the *fact* of attachment to the principles of the Constitution as matters of the first importance. The applicant's behavior is significant to the extent that it tends to establish or negative these facts.

But proof of good behavior does not close the inquiry. Why does the statute require examination of the applicant and witnesses in open court and under oath, and for what purpose is the government authorized to cross-examine concerning any matter *touching* or in any way *affecting* the right of naturalization? Clearly, it would seem, in order that the court and the government, whose power and duty in that respect these provisions take for granted, may discover whether the applicant is fitted for citizenship;—and to that end, by actual inquiry, ascertain, among other things, whether he has intelligence and good character; whether his oath to support and defend the Constitution and laws of the United States, and to bear true faith and allegiance to the same, will be taken without mental reservation or purpose inconsistent therewith; whether his views are compatible with the obligations and duties of American citizenship; whether he will upon his own part observe the laws of the land; whether he is willing to support the government in time of war, as well as in time of peace, and to assist in the defense of the country, not to the extent or in the manner that he may choose, but to such extent and in such manner as he lawfully may be required to do. These, at least, are matters which are of the essence of the statutory requirements, and in respect of which the mind and conscience of the applicant

may be probed by pertinent inquiries, as fully as the court, in the exercise of a sound discretion, may conclude is necessary.

The settled practice of the courts having jurisdiction in naturalization proceedings has, from the beginning, been in accordance with this view. *In re Bodek*, 63 Fed. 813; *In re Meakins*, 164 Fed. 334; *In re Madurri*, 176 Fed. 465, 466; *In re Ross*, 188 Fed. 685; *United States* v. *Bressi*, 208 Fed. 369, 372; *Schurmann* v. *United States*, 264 Fed. 917, 920; *In re Sigelman*, 268 Fed. 217. And it finds support in the decisions of this Court. As early as 1830, in *Spratt* v. *Spratt*, 4 Pet. 393, 407, Chief Justice Marshall, speaking for the Court, said:

" The various acts upon the subject submit the decision on the right of aliens to admission as citizens to courts of record. They are to receive testimony, to compare it with the law, and to judge on both law and fact." *United States* v. *Schwimmer*, 279 U. S. 644, 649.

With the foregoing statutory provisions and the scope of the powers and duties of the courts of first instance in respect thereof in mind, we come to a consideration of the case now before us. The applicant had complied with all the formal requirements of the law, and his personal character and conduct were shown to be good in all respects. His right to naturalization turns altogether upon the effect to be given to certain answers and qualifying statements made in response to interrogatories propounded to him.

Upon the preliminary form for petition for naturalization, the following questions, among others, appear: " 20. Have you read the following oath of allegiance? [which is then quoted]. Are you willing to take this oath in becoming a citizen? " " 22. If necessary, are you willing to take up arms in defense of this country? " In response to the questions designated 20, he answered " Yes." In response to the question designated 22, he answered, " Yes; but I should want to be free to judge of the neces-

sity." By a written memorandum subsequently filed, he amplified these answers as follows:

"20 and 22. I am willing to do what I judge to be in the best interests of my country, but only in so far as I can believe that this is not going to be against the best interests of humanity in the long run. I do not undertake to support 'my country, right or wrong' in any dispute which may arise, and I am not willing to promise beforehand, and without knowing the cause for which my country may go to war, either that I will or that I will not 'take up arms in defense of this country,' however 'necessary' the war may seem to be to the Government of the day.

"It is only in a sense consistent with these statements that I am willing to promise to 'support and defend' the Government of the United States 'against all enemies, foreign and domestic.' But, just because I am not certain that the language of questions 20 and 22 will bear the construction I should have to put upon it in order to be able to answer them in the affirmative, I have to say that I do not know that I can say 'Yes' in answer to these two questions."

Upon the hearing before the district court on the petition, he explained his position more in detail. He said that he was not a pacifist; that if allowed to interpret the oath for himself he would interpret it as not inconsistent with his position and would take it. He then proceeded to say that he would answer question 22 in the affirmative only on the understanding that he would have to believe that the war was morally justified before he would take up arms in it or give it his moral support. He was ready to give to the United States all the allegiance he ever had given or ever could give to any country, but he could not put allegiance to the government of any country before allegiance to the will of God. He did not anticipate engaging in any propaganda against the prosecution of a war which the

government had already declared and which it considered to be justified; but he preferred not to make any absolute promise at the time of the hearing, because of his ignorance of all the circumstances which might affect his judgment with reference to such a war. He did not question that the government under certain conditions could regulate and restrain the conduct of the individual citizen, even to the extent of imprisonment. He recognized the principle of the submission of the individual citizen to the opinion of the majority in a democratic country; but he did not believe in having his own moral problems solved for him by the majority. The position thus taken was the only one he could take consistently with his moral principles and with what he understood to be the moral principles of Christianity. He recognized, in short, the right of the government to restrain the freedom of the individual for the good of the social whole; but was convinced, on the other hand, that the individual citizen should have the right respectfully to withhold from the government military services (involving, as they probably would, the taking of human life), when his best moral judgment would compel him to do so. He was willing to support his country, even to the extent of bearing arms, if asked to do so by the government, in any war which he could regard as morally justified.

There is more to the same effect, but the foregoing is sufficient to make plain his position.

These statements of the applicant fairly disclose that he is unwilling to take the oath of allegiance, except with these important qualifications: That he will do what he judges to be in the best interests of the country only in so far as he believes it will not be against the best interests of humanity in the long run; that he will not assist in the defense of the country by force of arms or give any war his moral support unless he believes it to be morally justified, however necessary the war might

seem to the government of the day; that he will hold himself free to judge of the morality and necessity of the war, and, while he does not anticipate engaging in propaganda against the prosecution of a war declared and considered justified by the government, he prefers to make no promise even as to that; and that he is convinced that the individual citizen should have the right to withhold his military services when his best moral judgment impels him to do so.

Thus stated, the case is ruled in principle by *United States* v. *Schwimmer, supra.* In that case the applicant, a woman, testified that she would not take up arms in defense of the country. She was willing to be treated on the basis of a conscientious objector who refused to take up arms in the recent war, and seemed to regard herself as belonging in that class. She was an uncompromising pacifist, with no sense of nationalism, and only a cosmic sense of belonging to the human family. Her objection to military service, we concluded, rested upon reasons other than her inability to bear arms because of sex or age; and we held that her application for naturalization should be denied upon the ground, primarily, that she failed to sustain the burden of showing that she did not oppose the principle making it a duty of citizens, by force of arms when necessary, to defend their country against its enemies. At page 650 we said:

" That it is the duty of citizens by force of arms to defend our government against all enemies whenever necessity arises is a fundamental principle of the Constitution.

" The common defense was one of the purposes for which the people ordained and established the Constitution. . . . We need not refer to the numerous statutes that contemplate defense of the United States, its Constitution and laws by armed citizens. This Court, in the *Selective Draft Law Cases,* 245 U. S. 366, speaking through Chief Justice White, said (p. 378) that ' the very concep-

tion of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need. . . .'

"Whatever tends to lessen the willingness of citizens to discharge their duty to bear arms in the country's defense detracts from the strength and safety of the Government. And their opinions and beliefs as well as their behavior indicating a disposition to hinder in the performance of that duty are subjects of inquiry under the statutory provisions governing naturalization and are of vital importance, for if all or a large number of citizens oppose such defense the 'good order and happiness' of the United States can not long endure. And it is evident that the views of applicants for naturalization in respect of such matters may not be disregarded. The influence of conscientious objectors against the use of military force in defense of the principles of our Government is apt to be more detrimental than their mere refusal to bear arms. The fact that, by reason of sex, age or other cause, they may be unfit to serve does not lessen their purpose or power to influence others. It is clear from her own statements that the declared opinions of respondent as to armed defense by citizens against enemies of the country were directly pertinent to the investigation of her application."

And see *In re Roeper,* 274 Fed. 490; *Clarke's Case,* 301 Pa. 321; 152 Atl. 92.

There are few finer or more exalted sentiments than that which finds expression in opposition to war. Peace is a sweet and holy thing, and war is a hateful and an abominable thing to be avoided by any sacrifice or concession that a free people can make. But thus far mankind has been unable to devise any method of indefinitely prolonging the one or of entirely abolishing the other; and, unfortunately, there is nothing which seems to afford

positive ground for thinking that the near future will witness the beginning of the reign of perpetual peace for which good men and women everywhere never cease to pray. The Constitution, therefore, wisely contemplating the ever-present possibility of war, declares that one of its purposes is to " provide for the common defense." In express terms Congress is empowered " to declare war," which necessarily connotes the plenary power to wage war with all the force necessary to make it effective; and " to raise . . . armies," which necessarily connotes the like power to say who shall serve in them and in what way.

From its very nature, the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams,—" This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life." To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war.

These are but illustrations of the breadth of the power; and it necessarily results from their consideration that whether any citizen shall be exempt from serving in the armed forces of the Nation in time of war is dependent upon the will of Congress and not upon the scruples of the individual, except as Congress provides. That body, thus far, has seen fit, by express enactment, to relieve from the obligation of armed service those persons who belong to the class known as conscientious objectors; and this policy is of such long standing that it is thought by some to be beyond the possibility of alteration. Indeed, it seems to be assumed in this case that the privilege is one that Congress itself is powerless to take away. Thus it is said in the carefully prepared brief of respondent:

" To demand from an alien who desires to be naturalized an unqualified promise to bear arms in every war that may be declared, despite the fact that he may have conscientious religious scruples against doing so in some hypothetical future war, would mean that such an alien would come into our citizenry on an unequal footing with the native born, and that he would be forced, as the price of citizenship, to forego a privilege enjoyed by others. That is the manifest result of the fixed principle of our Constitution, zealously guarded by our laws, that a citizen cannot be forced and need not bear arms in a war if he has conscientious religious scruples against doing so." ·

This, if it means what it seems to say, is an astonishing statement. Of course, there is no such principle of the Constitution, fixed or otherwise. The conscientious objector is relieved from the obligation to bear arms in obedience to no constitutional provision, express or implied; but because, and only because, it has accorded with the policy of Congress thus to relieve him. The

624

alien, when he becomes a naturalized citizen, acquires, with one exception, every right possessed under the Constitution by those citizens who are native born (*Luria* v. *United States*, 231 U. S. 9, 22); but he acquires no more. The privilege of the native-born conscientious objector to avoid bearing arms comes not from the Constitution, but from the acts of Congress. That body may grant or withhold the exemption as in its wisdom it sees fit; and if it be withheld, the native-born conscientious objector cannot successfully assert the privilege. No other conclusion is compatible with the well-nigh limitless extent of the war powers as above illustrated, which include, by necessary implication, the power, in the last extremity, to compel the armed service of any citizen in the land, without regard to his objections or his views in respect of the justice or morality of the particular war or of war in general. In *Jacobson* v. *Massachusetts*, 197 U. S. 11, 29, this Court, speaking of the liberties guaranteed to the individual by the Fourteenth Amendment, said:

". . . and yet he may be compelled, by force if need be, against his will and without regard to his personal wishes or his pecuniary interests, or even his religious or political convictions, to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense."

The applicant for naturalization here is unwilling to become a citizen with this understanding. He is unwilling to leave the question of his future military service to the wisdom of Congress where it belongs, and where every native born or admitted citizen is obliged to leave it. In effect, he offers to take the oath of allegiance only with the qualification that the question whether the war is necessary or morally justified must, so far as his support is concerned, be conclusively determined by reference to his opinion.

When he speaks of putting his allegiance to the will
of God above his allegiance to the government, it is
evident, in the light of his entire statement, that he
means to make *his own interpretation* of the will of God
the decisive test which shall conclude the government
and stay its hand. We are a Christian people (*Holy
Trinity Church* v. *United States*, 143 U. S. 457, 470–471),
according to one another the equal right of religious free-
dom, and acknowledging with reverence the duty of obedi-
ence to the will of God. But, also, we are a Nation with
the duty to survive; a Nation whose Constitution con-
templates war as well as peace; whose government must
go forward upon the assumption, and safely can proceed
upon no other, that unqualified allegiance to the Nation
and submission and obedience to the laws of the land,
as well those made for war as those made for peace, are
not inconsistent with the will of God.

The applicant here rejects that view. He is unwilling
to rely, as every native born citizen is obliged to do, upon
the probable continuance by Congress of the long estab-
lished and approved practice of exempting the honest con-
scientious objector, while at the same time asserting his
willingness to conform to whatever the future law con-
stitutionally shall require of him; but discloses a present
and fixed purpose to refuse to give his moral or armed
support to any future war in which the country may be
actually engaged, if, in his opinion, the war is not morally
justified, the opinion of the Nation as expressed by Con-
gress to the contrary notwithstanding.

If the attitude of this claimant, as shown by his state-
ments and the inferences properly to be deduced from
them, be held immaterial to the question of his fitness for
admission to citizenship, where shall the line be drawn?
Upon what ground of distinction may we hereafter reject
another applicant who shall express his willingness to re-

spect any particular principle of the Constitution or obey any future statute only upon the condition that he shall entertain the opinion that it is morally justified? The applicant's attitude, in effect, is a refusal to take the oath of allegiance except in an altered form. The qualifications upon which he insists, it is true, are made by parol and not by way of written amendment to the oath; but the substance is the same.

It is not within the province of the courts to make bargains with those who seek naturalization. They must accept the grant and take the oath in accordance with the terms fixed by the law, or forego the privilege of citizenship. There is no middle choice. If one qualification of the oath be allowed, the door is opened for others, with utter confusion as the probable final result. As this Court said in *United States* v. *Manzi,* 276 U. S. 463, 467:

" Citizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant."

The Naturalization Act is to be construed " with definite purpose to favor and support the Government," and the United States is entitled to the benefit of any doubt which remains in the mind of the court as to any essential matter of fact. The burden was upon the applicant to show that his views were not opposed to " the principle that it is a duty of citizenship, by force of arms when necessary, to defend the country against all enemies, and that [his] opinions and beliefs would not prevent or impair the true faith and allegiance required by the Act." *United States* v. *Schwimmer, supra,* 649, 650, 653. We are of opinion that he did not meet this requirement. The examiner and the court of first instance who heard and weighed the evidence and saw the applicant and witnesses so concluded. That conclusion, if we were in

doubt, would not be rejected except for good and persuasive reasons, which we are unable to find.

> *The decree of the court of appeals is reversed and that of the district court is affirmed.*

Mr. Chief Justice Hughes, dissenting.

I am unable to agree with the judgment in this case. It is important to note the precise question to be determined. It is solely one of law, as there is no controversy as to the facts. The question is not whether naturalization is a privilege to be granted or withheld. That it is such a privilege is undisputed. Nor, whether the Congress has the power to fix the conditions upon which the privilege is granted. That power is assumed. Nor, whether the Congress may in its discretion compel service in the army in time of war or punish the refusal to serve. That power is not here in dispute. Nor is the question one of the authority of Congress to exact a promise to bear arms as a condition of its grant of naturalization. That authority, for the present purpose, may also be assumed.

The question before the Court is the narrower one whether the Congress has exacted such a promise. That the Congress has not made such an express requirement is apparent. The question is whether that exaction is to be implied from certain general words which do not, as it seems to me, either literally or historically, demand the implication. I think that the requirement should not be implied, because such a construction is directly opposed to the spirit of our institutions and to the historic practice of the Congress. It must be conceded that departmental zeal may not be permitted to outrun the authority conferred by statute. If such a promise is to be demanded, contrary to principles which have been respected as fundamental, the Congress should exact it in unequivocal

terms, and we should not, by judicial decision, attempt to perform what, as I see it, is a legislative function.

In examining the requirements for naturalization, we find that the Congress has expressly laid down certain rules which concern the opinions and conduct of the applicant. Thus it is provided that no person shall be naturalized "who disbelieves in or who is opposed to organized government, or who is a member of or affiliated with any organization entertaining and teaching such disbelief in or opposition to organized government, or who advocates or teaches the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specified individuals or of officers generally, of the Government of the United States, or of any other organized government, because of his or their official character, or who is a polygamist." Act of June 29, 1906, c. 3592, § 7; 34 Stat. 596, 598; U. S. C. Tit. 8, § 364. The respondent, Douglas Clyde Macintosh, entertained none of these disqualifying opinions and had none of the associations or relations disapproved. Among the specific requirements as to beliefs, we find none to the effect that one shall not be naturalized if by reason of his religious convictions he is opposed to war or is unwilling to promise to bear arms. In view of the questions which have repeatedly been brought to the attention of the Congress in relation to such beliefs, and having regard to the action of the Congress when its decision was of immediate importance in the raising of armies, the omission of such an express requirement from the naturalization statute is highly significant.

Putting aside these specific requirements as fully satisfied, we come to the general conditions imposed by the statute. We find one as to good behavior during the specified period of residence preceding application. No applicant could appear to be more exemplary than Macintosh. A Canadian by birth, he first came to the United

States as a graduate student at the University of Chicago, and in 1907 he was ordained as a Baptist minister. In 1909 he began to teach in Yale University and is now a member of the faculty of the Divinity School, Chaplain of the Yale Graduate School, and Dwight Professor of Theology. After the outbreak of the Great War, he voluntarily sought appointment as a chaplain with the Canadian Army and as such saw service at the front. Returning to this country, he made public addresses in 1917 in support of the Allies. In 1918, he went again to France where he had charge of an American Y. M. C. A. hut at the front until the armistice, when he resumed his duties at Yale University. It seems to me that the applicant has shown himself in his behavior and character to be highly desirable as a citizen and, if such a man is to be excluded from naturalization, I think the disqualification should be found in unambiguous terms and not in an implication which shuts him out and gives admission to a host far less worthy.

The principal ground for exclusion appears to relate to the terms of the oath which the applicant must take. It should be observed that the respondent was willing to take the oath, and he so stated in his petition. But, in response to further inquiries, he explained that he was not willing " to promise beforehand " to take up arms, " without knowing the cause for which my country may go to war" and that " he would have to believe that the war was morally justified." He declared that " his first allegiance was to the will of God "; that he was ready to give to the United States " all the allegiance he ever had given or ever could give to any country, but that he could not put allegiance to the Government of any country before allegiance to the will of God." The question then is whether the terms of the oath are to be taken as necessarily implying an assurance of willingness to bear arms, so that one whose conscientious convictions or belief of su-

preme allegiance to the will of God will not permit him to make such an absolute promise, cannot take the oath and hence is disqualified for admission to citizenship.

The statutory provision as to the oath which is said to require this promise is this: " that he will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same." Act of June 29, 1906, c. 3592, § 4, 34 ̃Stat. 596, 598; U. S. C. Tit. 8, ¡§ 381. That these general words have not been regarded as implying a promise to bear arms notwithstanding religious or conscientious scruples, or as requiring one to promise to put allegiance to temporal power above what is sincerely believed to be one's duty of obedience to God, is apparent, I think, from a consideration of their history. This oath does not stand alone. It is the same oath in substance that is required by Act of Congress of civil officers generally (except the President, whose oath is prescribed by the Constitution). The Congress, in prescribing such an oath for civil officers, acts under Article VI, section 3, of the Constitution, which provides: " The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious test shall ever be required as a Qualification to any Office or public Trust under the United States." The general oath of office, in the form which has been prescribed by the Congress for over sixty years, contains the provision " that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion." (R. S. § 1757, U. S. C., Tit. 5, § 16.) It goes without

saying that it was not the intention of the Congress in framing the oath to impose any religious test. When we consider the history of the struggle for religious liberty, the large number of citizens of our country, from the very beginning, who have been unwilling to sacrifice their religious convictions, and in particular, those who have been conscientiously opposed to war and who would not yield what they sincerely believed to be their allegiance to the will of God, I find it impossible to conclude that such persons are to be deemed disqualified for public office in this country because of the requirement of the oath which must be taken before they enter upon their duties. The terms of the promise " to support and defend the Constitution of the United States against all enemies, foreign and domestic," are not, I think, to be read as demanding any such result. There are other and most important methods of defense, even in time of war, apart from the personal bearing of arms. We have but to consider the defense given to our country in the late war, both in industry and in the field, by workers of all sorts, by engineers, nurses, doctors and chaplains, to realize that there is opportunity even at such a time for essential service in the activities of defense which do not require the overriding of such religious scruples. I think that the requirement of the oath of office should be read in the light of our regard from the beginning for freedom of conscience. While it has always been recognized that the supreme power of government may be exerted and disobedience to its commands may be punished, we know that with many of our worthy citizens it would be a most heart-searching question if they were asked whether they would promise to obey a law believed to be in conflict with religious duty. Many of their most honored exemplars in the past have been willing to suffer imprisonment or even death rather than to make such a promise. And we also know, in particular, that a promise to engage

in war by bearing arms, or thus to engage in a war believed to be unjust, would be contrary to the tenets of religious groups among our citizens who are of patriotic purpose and exemplary conduct.   To conclude that the general oath of office is to be interpreted as disregarding the religious scruples of these citizens and as disqualifying them for office because they could not take the oath with such an interpretation would, I believe, be generally regarded as contrary not only to the specific intent of the Congress but as repugnant to the fundamental principle of representative government.

But the naturalization oath is in substantially the same terms as the oath of office to which I have referred.   I find no ground for saying that these words are to be interpreted differently in the two cases.   On the contrary, when the Congress reproduced the historic words of the oath of office in the naturalization oath, I should suppose that, according to familiar rules of interpretation, they should be deemed to carry the same significance.

The question of the proper interpretation of the oath is, as I have said, distinct from that of legislative policy in exacting military service.   The latter is not dependent upon the former.   But the long-established practice of excusing from military service those whose religious convictions oppose it confirms the view that the Congress in the terms of the oath did not intend to require a promise to give such service.   The policy of granting exemptions in such cases has been followed from colonial times and is abundantly shown by the provisions of colonial and state statutes, of state constitutions, and of acts of Congress.   See citations in the opinion of the Circuit Court of Appeals in the present case.   42 F. (2d) 845, 847, 848. The first constitution of New York, adopted in 1777, in providing for the state militia, while strongly emphasizing the duty of defense, added " That all such of the inhabitants of this state (being of the people called Quakers)

as, from scruples of conscience may be averse to the bearing of arms, be therefrom excused by the legislature, and do pay to the state such sums of money, in lieu of their personal service, as the same may, in the judgment of the legislature, be worth." Art. XL. A large number of similar provisions are found in other States. The importance of giving immunity to those having conscientious scruples against bearing arms has been emphasized in debates in Congress repeatedly from the very beginning of our government, and religious scruples have been recognized in draft acts. Annals of Congress (Gales), 1st Congress, vol. I, pp. 434, 436, 729, 731; vol. II, pp. 1818–1827; Acts of February 24, 1864, 13 Stat. 6, 9; January 21, 1903, 32 Stat. 775; June 3, 1916, 39 Stat. 166, 197; May 18, 1917, 40 Stat. 76, 78. I agree with the statement in the opinion of the Circuit Court of Appeals in the present case that " This Federal legislation is indicative of the actual operation of the principles of the Constitution, that a person with conscientious or religious scruples need not bear arms, although as a member of society, he may be obliged to render services of a non-combatant nature."

Much has been said of the paramount duty to the State, a duty to be recognized, it is urged, even though it conflicts with convictions of duty to God. Undoubtedly that duty to the State exists within the domain of power, for government may enforce obedience to laws regardless of scruples. When one's belief collides with the power of the State, the latter is supreme within its sphere and submission or punishment follows. But, in the forum of conscience, duty to a moral power higher than the State has always been maintained. The reservation of that supreme obligation, as a matter of principle, would unquestionably be made by many of our conscientious and law-abiding citizens. The essence of religion is belief in a relation to God involving duties superior to those

arising from any human relation.  As was stated by Mr. Justice Field, in *Davis* v. *Beason,* 133 U. S. 333, 342: " The term ' religion ' has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will." One cannot speak of religious liberty, with proper appreciation of its essential and historic significance, without assuming the existence of a belief in supreme allegiance to the will of God.  Professor Macintosh, when pressed by the inquiries put to him, stated what is axiomatic in religious doctrine.  And, putting aside dogmas with their particular conceptions of deity, freedom of conscience itself implies respect for an innate conviction of paramount duty.  The battle for religious liberty has been fought and won with respect to religious beliefs and practices, which are not in conflict with good order, upon the very ground of the supremacy of conscience within its proper field.  What that field is, under our system of government, presents in part a question of constitutional law and also, in part, one of legislative policy in avoiding unnecessary clashes with the dictates of conscience.  There is abundant room for enforcing the requisite authority of law as it is enacted and requires obedience, and for maintaining the conception of the supremacy of law as essential to orderly government, without demanding that either citizens or applicants for citizenship shall assume by oath an obligation to regard allegiance to God as subordinate to allegiance to civil power.  The attempt to exact such a promise, and thus to bind one's conscience by the taking of oaths or the submission to tests, has been the cause of many deplorable conflicts.  The Congress has sought to avoid such conflicts in this country by respecting our happy tradition. In no sphere of legislation has the intention to prevent such clashes been more conspicuous than in relation to the bearing of arms.  It would require strong evidence

that the Congress intended a reversal of its policy in prescribing the general terms of the naturalization oath. I find no such evidence.

Nor is there ground, in my opinion, for the exclusion of Professor Macintosh because his conscientious scruples have particular reference to wars believed to be unjust. There is nothing new in such an attitude. Among the most eminent statesmen here and abroad have been those who condemned the action of their country in entering into wars they thought to be unjustified. Agreements for the renunciation of war presuppose a preponderant public sentiment against wars of aggression. If, while recognizing the power of Congress, the mere holding of religious or conscientious scruples against all wars should not disqualify a citizen from holding office in this country, or an applicant otherwise qualified from being admitted to citizenship, there would seem to be no reason why a reservation of religious or conscientious objection to participation in wars believed to be unjust should constitute such a disqualification.

Apart from the terms of the oath, it is said that the respondent has failed to meet the requirement of " attachment to the principles of the Constitution." Here, again, is a general phrase which should be construed, not in opposition to, but in accord with, the theory and practice of our Government in relation to freedom of conscience. What I have said as to the provisions of the oath I think applies equally to this phase of the case.

The judgment in *United States* v. *Schwimmer*, 279 U. S. 644, stands upon the special facts of that case, but I do not regard it as requiring a reversal of the judgment here. I think that the judgment below should be affirmed.

MR. JUSTICE HOLMES, MR. JUSTICE BRANDEIS and MR. JUSTICE STONE concur in this opinion.