## In re DE MAYO.
### No. 7374.

District Court, W. D. Missouri, W. D.
Dec. 30, 1938.

Walter W. Calvin, of Calvin & Kimbrell, all of Kansas City, Mo., for De Mayo.

Sam C. Blair, Asst. U. S. Dist. Atty., of Kansas City, Mo., for U. S. District Attorney's office.

Michael McCaul, of Kansas City, Mo., for Department of Immigration and Naturalization Service.

REEVES, District Judge.

This is an application for admission as a citizen. The applicant has exercised a right granted by paragraph (c) of Section 399a, Title 8 U.S.C.A. (referring to the general subject of Aliens and Citizenship), to demand a hearing and an examination of the applicant and his witnesses under oath in open court.

Heretofore the court designated examiners from the Immigration and Naturalization Service to conduct preliminary hearings upon petitions for naturalization as provided by Section 399a, Title 8 U.S.C.A.

Such a hearing was conducted in this case, and the findings and recommendations of the examiner have been submitted to the court. Such recommendations were adverse to the applicant and he accordingly made his demand for a hearing before the court. This procedure is in the nature of an appeal from the findings and recommendations of the designated examiner.

Such hearing has been held and representatives of the Immigration and Naturalization Service exercised the right or privilege provided by statute to examine witnesses, including a cross-examination of the applicant, and to offer other evidence on the question of the fitness of the applicant for citizenship.

At the conclusion of the hearing the matter was to be submitted by the parties on briefs of the facts and the law. This has been done. Objections were made to the admission of the applicant to citizenship upon the several grounds of a lack of moral character and that he was not attached to the principles of the Constitution of the United States, and that, moreover, he was not well disposed to the good order and happiness of the United States.

The testimony showed that in the course of the preliminary examinations the designated examiner had inquired of the appli-

cant relative to arrests to which he had been subjected by the authorities, not only within the past five years, but during the period reaching back to his entry into the United States. The applicant admitted a large number of arrests and designated the time and place and causes of such arrests. There were several arrests that he did not disclose. The examinations were under oath as prescribed by statute. It was developed both in the preliminary examination and at the hearing in open court that the applicant had not only been arrested many times, but that he had been convicted of the commission of crimes classed as felonies, and on account of such convictions in federal courts he had been sentenced to serve terms in the United States prison at Leavenworth, Kansas. The aggregate of this sentence was three years. A large number of indictments from time to time had been returned against him by different grand juries in this court. The number was fixed at fourteen. In addition thereto he had been indicted in other jurisdictions. One of the convictions was under a prosecution upon indictment returned against him in the District of Kansas, and, after affirmance, he served a sentence in the Federal prison at Leavenworth. There was, in like manner, a conviction in the state of Oklahoma resulting in a fine only, and this was paid.

After numerous inconclusive trials on some of the indictments in this court he entered a plea of guilty and was sentenced to the penitentiary, and, in another case where tried and convicted, there was an affirmance. The applicant testified with commendable frankness that until his incarceration in prison for violations of the law he had habitually violated both federal and state laws. In his testimony he said that he had obtained protection during his transgressions by paying money to officials charged with the responsibility of enforcing the law. He gave the number of officials thus paid at forty, approximately thirty of whom were federal officers.

In his testimony before the examiner, the number of corrupted officers was fixed at fifty.

Both the testimony of the applicant and that of his witnesses was to the effect that, after his liberation from federal prison, he had lived an exemplary life. The witnesses testified that he was moral and upright, charitably disposed, and was devoted to the principles of the Constitution. It was the expressed belief of his witnesses, and confirmed by the applicant's testimony that he had completely reformed, and that his model life and exemplary conduct were an earnest and fair promise of good citizenship, if admitted.

Other facts will be stated as they may become pertinent in the course of this memorandum opinion.

1. As a preliminary to a correct decision of the case, a few fundamental principles should be stated.

In the first place, it is the law that, "Foreigners who come to the United States are not granted citizenship as a privilege which they may demand, but as an act of grace for which they should humbly sue. In the exercise of this grace the government of the United States may fix such conditions as it sees fit." In re Sigelman, D.C., 268 F. 217.

The conditions upon which an admission to citizenship may be granted are: (a) That the applicant is of good moral character; (b) attached to the principles of the Constitution of the United States; (c) and well disposed to the good order and happiness of the same. Section 382, Title 8 U.S.C.A. This same section devolves upon the applicant the duty to prove these conditions "to the satisfaction of the court."

It becomes the duty of the court to decide, in admitting an applicant to citizenship, whether the proof establishes beyond doubt the possession of these qualifications by the applicant. This is so, because, "Citizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." United States v. Manzi, 276 U.S. 463, loc. cit. 467, 48 S.Ct. 328, loc. cit. 329, 72 L.Ed. 654.

As stated in United States v. MacIntosh, 283 U.S. 605, loc. cit. 615, 51 S.Ct. 570, loc. cit. 572, 75 L.Ed. 1302: "Naturalization is a privilege, to be given, qualified, or withheld as Congress may determine, and which the alien may claim as of right only upon compliance with the terms which Congress imposes. That Congress regarded the admission to citizenship as a serious matter is apparent from the conditions and precautions with which it carefully surrounded the subject." And, in the same opinion, loc. cit. 616, 51 S.Ct. loc. cit. 572, the court said: "That Congress regarded the *fact* of good character and the

*fact* of attachment to the principles of the Constitution as matters of the first importance." And, the court continued: *"The applicant's behavior is significant to the extent that it tends to establish or negative these facts."*

2. It was the contention of the applicant that inquiries regarding his conduct were improper back of the five-year period.

It was that fact that probably caused him to treat lightly his failure to enumerate all of the arrests to which he had been subjected prior to his incarceration in and discharge from the penitentiary in 1931. It was emphasized by the applicant in his testimony that he had frankly confessed a bad record prior to his imprisonment.

In the case of United States v. Etheridge, D.C., 41 F.2d 762, loc. cit. 763, the court aptly said: "The burden of proof is on the petitioner to establish these facts by relevant and competent testimony. It is incumbent upon him, when requested, to honestly and truthfully disclose the facts bearing on his moral conduct during and before the five-year period, in order that the court may determine whether, taking into account his whole conduct, he has in fact been a man of good moral character during the five-year period."

As stated in Re McNeil, D.C., 14 F. Supp. 394, loc. cit. 395: "The test in any naturalization case is whether the candidate is, in law and in fact, actually entitled to citizenship. The burden is upon the applicant to meet the requirements of the statute, and any doubt shall be resolved in favor of the government."

■ Notwithstanding the fact that the applicant has been arrested so often that it seemed a work of supererogation to specify additional arrests, yet, nevertheless under the law this was material, and it was the duty of the applicant to recall the details and truthfully impart same to the examiner. This was particularly true in view of the applicant's admittedly bad record. See Gaglione v. United States, 1 Cir., 35 F.2d 496, 497, where it was well said: "It was the duty of the examiner to take all evidence pertinent to the proper performance of his duty in making a recommendation to the court concerning the fitness of the applicant for naturalization, including his moral character. His function was closely analogous to that of a master in equity."

3. The question of prior convictions upon felony charges becomes very important.

In the oft-quoted and uniformly approved case of In re Ross, C.C., 188 F. 685, admission to citizenship was denied upon the sole ground that the applicant had been convicted upon a second-degree murder charge many years before he applied for citizenship. When his application was filed he had been discharged from prison more than five years. It was suggested by the court that both before his conviction and after his discharge, "The conduct of the petitioner reveals no cause for censure, and if his personal welfare alone was entitled to consideration the conferring of the rights of citizenship might be considered as proper aid and encouragement."

The court, in deciding the case and denying citizenship, pointed out that: "The evil resulting from such practice would immeasurably exceed the personal benefits conferred from such attempts at dispensing charity. Citizenship is not to be debauched by conferring on the criminal class its sacred privileges."

In the case of In re Addis, D.C., 252 F. 886, 887, an application for citizenship was denied because of a prior conviction. The court expressed the opinion that such a conviction "precludes the offender from claiming successfully that he has behaved as a man well disposed to the good order and happiness" of the United States. In the Addis case the applicant had been pardoned by the president.

In Re McNeil, D.C., 14 F.Supp. 394, citizenship was denied because of a prior conviction. The same ruling was made in Re Caroni, D.C., 13 F.2d 954. The decision in the latter case was put squarely upon the rule announced in Re Ross, supra. A similar situation was presented to a New York state court. In the case of In re Capozzi, 160 Misc. 200, 289 N.Y.S. 869, 874, it was said: "It is in exceptional cases only that persons who have been convicted of a felony should be admitted to citizenship. Such persons should never be granted citizenship papers unless they have procured in advance full and unconditional pardons. As a condition of entertaining the petitions of such persons, the court should require them to produce unconditional pardons."

4. The applicant in his testimony stated that his convictions were for offenses merely mala prohibita, that is to say, merely wrong, because prohibited.

It would be difficult to make a distinction in a naturalization case between crimes whether wrong because prohibited or wrong in themselves. It is the violation of law that counts. The petitioner had violated the national prohibition law in the illicit handling of intoxicating beverages. The courts, in dealing with the subject matter of intoxicating liquors, have never thus softly and lightly treated the subject. Uniformly, the courts have said that the traffic in intoxicating liquors for beverage purposes is an evil to be tolerated and regulated and not to be approved.

Be that as it may, there was evidence of other offenses and obviously wrong within themselves. The applicant testified that for a period of ten or twelve years before his final conviction he had paid many federal officers as well as many state officers for "protection". This meant that he had bribed them, or corrupted them, so that they refrained from the performance of their sworn duties. It is worthy of comment that no enemy of the government is greater or more dangerous than a corrupt public official. This is true, whether the corruption be the doing of wrongful acts, or the simple omission to perform a clear duty. Equally dangerous as a domestic enemy is the one who corrupts and induces a public official either to do a wrong thing or to neglect the performance of duties devolving upon him.

The oath an applicant for citizenship must take when admitted is not only one of renunciation of allegiance and fidelity to the sovereignty of his former citizenship, but the applicant pledges himself to "support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and bear true faith and allegiance to the same." 8 U.S.C.A. § 381.

The domestic enemy is more dangerous than the foreign enemy for the reason that history is replete with the record of governmental disintegration and decay arising solely from corruption within, which means the inroads of domestic enemies upon the basic foundations of the government.

In addition to the above, the evidence was undisputed that, in a conversation with an official of the government just before his discharge from the federal prison, the applicant expressed the conviction that all public officers of the government were corruptible and purchasable. There is no evidence that the attitude of mind as thus expressed by the applicant has undergone a change.

In a government "of the people, by the people, and for the people", so fervently supported by the members of the great American democracy, it cannot be said that one who entertains such a thought is, or could be attached to the principles of the Constitution. The very nature of the government requires confidence of its citizens in the efficiency and uprightness of the representatives of the people. To hold a contrary view would be to deny the practical and successful operation of representative government.

In view of the above, the application of the petitioner should be denied, and the recommendations of the examiner should be approved. It will be so ordered.