## Sonthoff's Naturalization

338

*John R. Graham* and *Michael A. Foley,* for petitioner.

*George Halberstadt,* for United States.

VAN RODEN, P. J., specially presiding, May 20 1949. —This is a petition for naturalization, filed on May 3, 1944 by Herbert Gunther Sonthoff, the spouse of a United States citizen. At the time of filing, petitioner resided in the Borough of Swarthmore, Delaware County, Pa. Consequently, although he now resides in Concord, Mass., this court retains jurisdiction in the matter.

The Nationality Act of October 14, 1940, c. 876, sec. 307, 54 Stat. at L. 1137, 8 U. S. C. §707, prescribes three mandatory requirements for naturalization:

1. Residence preceding filing of a petition. Ordinarily, petitioner must prove that he has resided continuously within the United States for at least five years immediately preceding the filing of the petition, but where petitioner is the spouse of a United States citizen, he is required to prove only three years of such residence: Nationality Act, supra, sec. 310 (*b*), 8 U. S. C. §710(*b*). It is conceded by the Government that petitioner has met this requirement.

2. Residence subsequent to filing petition. Petitioner must have resided continuously within the United States from the date of the petition up to the time of admission to citizenship. In the instant case, petitioner's continuous residence within the United States since the filing of the petition is not disputed.

3. Moral character and attachment to principles of the United States Constitution. It must also be demonstrated to the satisfaction of the court that petitioner "during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States". The Government raises no question concerning the moral character of petitioner, but has recommended denial of his application on the ground that he has failed to establish his attachment to the principles of the Constitution and to our form of government.

At the outset, it must be clearly recognized that citizenship is bestowed as a privilege and not as a matter of right: Petition of Ludecke, 31 F. Supp. 521 (D. C. Mich., 1940). The burden of satisfying the court that the statutory requirements have been met is upon petitioner: In re Lehman, 67 F. Supp. 114 (D. C. Pa., 1946), and the burden of proof never shifts to the Government, at least in the sense that the risk of nonpersuasion on any material issue remains with petitioner: Petition of Markert, 67 F. Supp. 36 (D. C. Pa., 1946). Any doubts concerning the grant of citizenship must be resolved in favor of the Government and against petitioner: U. S. v. Macintosh, 283 U. S. 605, 51 S. Ct. 570 (1931) ; Petition of Markert, supra.

It must also be recognized that any person's attachment to the Constitution of the United States and his disposition to the good order and happiness of the United States are mental attitudes, and that behavior is the best criterion of a mental attitude: U. S. v. Siepp, 56 F. Supp. 254 (D. C. Cal., 1944). Consequently, the issue in this case narrows down to a study of applicant's behavior, as exhibited in his actions and in the expressions of his thoughts and opinions.

340

The critical period in question is the three years immediately preceding the filing of the petition, that is, from May 3, 1941, to May 3, 1944, but the court is not confined to the minimum statutory period and may scrutinize petitioner's activities for a longer period in order to determine whether he meets the test of attachment to our form of government: Petition of Ludecke, supra. In the instant case, the court has carefully considered all the evidence in the case concerning the past history of petitioner, regardless of time limitations, in order to properly evaluate applicant's true disposition and to do justice as between the Government and petitioner.

The Government frankly and fairly concedes that applicant's character and reputation since the filing of the petition until the present time are entirely satisfactory, that during such period he has not exhibited any lack of attachment to the principles of our Constitution, and that there is no evidence of any conduct on his part during such period which would be detrimental to his application. It is the position of the Government that the applicant was formerly devoted or at least sympathetic to the Nazi Government of Germany and that it is therefore his burden to establish by competent evidence just when he underwent a change of ideology so as to warrant a reasonable belief in his present profession of attachment to our form of government during the period of statutory importance.

It appears from the testimony that petitioner was born in Germany in 1913. Upon the completion of his elementary education, he registered as a student at the University of Berlin in 1932. In November 1933 he became a probationary member in the Hitler S. S. Guard ("Black Shirts"), but was dishonorably dismissed in June 1934 when he refused to report for

duty at the time of the Nazi "blood purge". In the fall of 1934 he came to this country to study at the University of Georgia on an exchange fellowship, and while there, he gave lectures and distributed written matter which expressed pro-Nazi and pro-totalitarian views, although he now contends that such expressions did not reflect his personal views but merely answered inquiries concerning the Nazi regime and its philosophy. In 1936, upon the completion of his course at Georgia, he returned to Germany and accepted employment with the foreign branch of the German Railroads as a tourist conductor. He also worked for the Carl Schurz Foundation, and some of his writings, although unobjectionable per se, were used by the foundation in connection with propaganda for dissemination in foreign countries. While employed by the foundation, he escorted a "March of Time" cameraman on a tour of Germany. Such a project, of course, would have had to be approved by the official propaganda bureau.

. From 1938 until August 1939 petitioner was employed by the American Consulate in Berlin. While there, he was requested by a Nazi Government official to supply him with copies of confidential reports, but he refused to do so and reported the incident to the consul. In August 1939 he secured a visa to come to the United States for permanent residence. When he emigrated to this country, he retained his identification card as an employe of our State Department and later used this card to secure a permit to board a vessel arriving from Germany in the fall of 1939, where he met a young woman who had been employed in the consulate but had been discharged because of her pro-Nazi background. Although this incident is somewhat suspicious, there is no proof that anything irregular occurred or that the meeting was for any purpose other than to renew a previously existing friendship

or possibly romance. Later, however, this young woman told him of meeting a Nazi espionage agent in New York and petitioner promptly reported this fact to the Federal Bureau of Investigation.

He then obtained a graduate fellowship at Harvard University where he studied until 1941. While there, he gave lectures which were critical of Hitler and the Nazi Government. In the fall of 1942 he came to Swarthmore College where he taught political economy until 1945. While at Swarthmore he married an American citizen on October 15, 1943. In the summer of 1945 he and his wife moved to Massachusetts where he is now engaged in teaching political science at Mount Holyoke College and also at Smith College. He is also presently pursuing his graduate studies at Harvard in order to secure a Ph.D. degree.

While at Swarthmore, he volunteered for military service and was notified of his acceptance for service as an enemy alien. However, the Swarthmore College officials requested his deferment on the ground that he was needed to teach Navy units then stationed at the college. Later, he was classified as 4F, that is, physically unfit for service. This point is mentioned since it is recognized that willingness to serve in the armed forces of this country may be some indication of attachment to the principles of our government and it has also been held that the action of an alien in obtaining legitimate deferments from the draft reflects no disloyalty and cannot serve as a basis for denying his application for naturalization: Petition of Kohl, 146 F. (2d) 347 (C. C. A. N. Y., 1945).

During the war years, applicant was under the surveillance of the Federal Bureau of Investigation but the record does not indicate that any evidence was found which would indicate any subversive activities on his part. The real objections of the Government are based upon certain letters written by the applicant

in 1940 and 1941. Although these letters were addressed to friends in Germany and South America, they ultimately came into the hands of the Federal Bureau of Investigation. Certain excerpts from the said letters, as hereinafter set forth, when considered by themselves reflect unfavorably towards applicant and express sentiments which might well be construed to be inconsistent with true principles of American democracy and demonstrate that the Government's attitude in this matter is not arbitrary or entirely without basis. For example, in one of these letters dated February 6, 1940, addressed to a friend in Berlin, applicant wrote: "I hope with all my heart that conditions at home are more tolerable for the individual than the reports we get here. But you know that one cannot trust Jewish-Capitalistic-Democratic world press." In another letter to the same person dated July 31, 1940, he expressed his hope for "a German victory in the next war". In a letter dated July 21, 1941, addressed to a German friend then in South America, he wrote: "I do not intend to deny my adherence to the German cause and to renounce it and become an American. . . . I would not like to be thrown into a pot with immigrants and refugees." In the same letter, he also wrote: "I would not have left Germany, and I could also become convinced to fight for the Nazis, if I would not have had that feeling, which was felt during various generations; that feeling of justice, the human attitude, which found their expression, their political expression, in the State's rights, etc." On August 6, 1941, he wrote to the same friend that "I have neither the intention to become an American in every sense of the word nor do I intend to give up my European or German way of thinking and feeling. . . . There are things in the German style of life—if such exists—which I can

never give up and there are some things of which I am ashamed; there are things in the American mode of life that I admire and would take over and there are other things that I simply detest arrogantly—as a Nordic European, using the expression in our sense. I would like to do scientific work which is impossible in Germany today . . . it is impossible for me to believe in a 'national' essential difference in the intellectual scientific method . . . I come to the rejection of the present efforts of Nazism."

It is obvious that the letters contain certain expressions which indicate a hope for a German victory and an acceptance of certain, although not all of recognized Nazi concepts. At the same time, however, there are other expressions which definitely reject the fundamental Nazi doctrine of complete subservience of the individual to the state and it seems quite apparent from the letters that applicant exhibited a preference for the democratic rather than nationalistic theory of government. Nonetheless, certain portions of the letters are indeed unreconcilable with the principles of true Americanism and tend to justify the opposition of the Government towards this application for naturalization. If these letters were the sole evidence of the mental attitude of applicant during the critical period, this court would not hesitate to find that there was at least doubt as to applicant's attachment to the principles of our Constitution sufficient to warrant the rejection of the application. However, the explanation of applicant with respect to the objectionable portions of the letters is that expediency required him to incorporate therein certain favorable references to Germany in order to allay the suspicions of Nazi censors who might intercept the correspondence. While such explanation, of course, need not be accepted as verity, it is supported by applicant's exemplary conduct dur-

ing the critical period as testified to by witnesses of unimpeachable credibility and entitled to the highest respect. Thus, Dr. Everett L. Hunt, dean of Swarthmore College, testified that during the critical period in question, applicant identified himself very definitely with the principles of American democracy, that in all of his teachings at Swarthmore College and in his conversations at social gatherings he made no statements or suggestions which could possibly be construed as contrary to our form of government or to the American way of life.

Dr. James Roland Pennock, chairman of the Department of Political Science of Swarthmore College, applicant's immediate superior while teaching there, testified that the applicant "while he was at college, taught the subject of American Government, with which he was already quite familiar and did so in a way that was always most acceptable to the students, and in any discussions that I have had with him about things growing out of our mutual work and out of his teaching of political science and American Government left no doubt in my mind that he was a firm believer in the principles, let's say, of our Bill of Rights and our constitutional system generally, and that he understood them much better than probably most Americans, having seen not only how they operated but how the converse principles operated".

Professor Wolfgang F. Stolper, a member of the faculty of Swarthmore College and a Viennese refugee, whose brother was killed in a Nazi concentration camp, testified that he met applicant in 1940 at Harvard, as well as being subsequently associated with him at Swarthmore and that applicant gave every evidence of being "deeply attached" to our Constitution and that he frequently heard applicant express his prefer-

ence for American democracy as opposed to the other forms of government.

In addressing a meeting of the South Church Brotherhood at Pittsfield, Mass., on November 23, 1940 (reported in the Berkshire Evening Eagle), applicant warned of the menace of Nazism, was openly critical of the Hitler regime, favored the policy of American aid to Great Britain and warned of fifth column activity in this country.

In a public lecture at Hanover, New Hampshire, on July 30, 1942 (reported in the Hanover Gazette), applicant described the war as an issue between nationalism and humanism, and suggested that after the war, Germany should be ruled by an American military government for the period required to reëducate the German people in the principles of democracy.

In the opinion of the court, the unfavorable effect of certain portions of the letters above referred to is overcome by the testimony of applicant and his witnesses concerning his real opinions as expressed in his classroom lectures, public addresses and private social gatherings throughout the critical period. The instant case is similar to the Markert Case, supra, where the Government opposed an application for naturalization because petitioner had been a member of the German-American Bund and participated in some of its activities. The court held that although such facts would justify denial of the petition in the absence of other evidence of petitioner's attachment to the principles of the United States Constitution, nevertheless, the demeanor and testimony of applicant and her witnesses as to her conduct and reputation concerning her attachment to such principles overcame the doubt arising from her membership in that organization, and the petition for naturalization was granted.

Similarly, in the instant case, applicant's demeanor on the witness stand, his candid admission of past

actions which might be construed unfavorably against him, the sincerity and the conviction with which he expressed his present devotion to our Government and the democratic principles and the testimony of his highly reputable witnesses concerning applicant's exemplary conduct and his consistent expression of democratic sentiments during the critical period as well as during the period subsequent to the filing of the petition up until the hearing date, sufficiently overcome any doubts arising from the letters offered in evidence and prevent the letters from remaining an insurmountable obstacle to citizenship.

This matter has received the earnest and unhurried consideration of the court for we are fully aware of our deep responsibility in conferring the high honor and privilege of American citizenship upon an alien, especially one who might technically be classified as an enemy alien and we would not grant this petition unless sincerely and unreservedly convinced that applicant has fairly and fully met the burden of proving that he is deserving of American citizenship. We are convinced that this applicant, although subjected in his early youth to Nazi indoctrination, successfully escaped its perverting influence and came to recognize fully and clearly the advantages of the American type of democracy as opposed to any other form of government and for that reason voluntarily chose to leave his native land and emigrate to America for permanent residence, and now seeks citizenship in order to completely integrate himself with this country. Accordingly, the court finds as a fact that prior to May 3, 1941, and continuously since that date, applicant has demonstrated that he was and is attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. Finding that applicant has met all the

requirements for naturalization, the court enters the following

*Order*

And now, to wit, May 20, 1949, upon consideration of the above-captioned petition for naturalization, it is hereby ordered, adjudged and decreed as follows:

1. The petition of Herbert Gunther Sonthoff for naturalization as a citizen of the United States of America be and the same is hereby granted and the said Herbert Gunther Sonthoff is directed to appear before a proper tribunal to take the required oath of allegiance, sec. leg. et sec. reg.

2. The parties shall bear their respective costs.

3. An exception is hereby allowed to the Government.