BROWN, Price Administrator, Office of Price Administration, v. CUMMINS DISTILLERIES CORPORATION et al.

No. 584.

District Court, W. D. Kentucky, Louisville Division.

Jan. 22, 1944.

George J. Burke, Gen. Counsel, and Thomas I. Emerson, Associate Gen. Counsel, both of Washington, D.C., James C. Greuner, Regional Atty., and Robert H. Trenkamp, Regional Enforcement Atty., both of Cleveland, Ohio, Raymond C. Stephenson, Chief Atty., of Louisville, Ky., Fritz Krueger, Chief Enforcement Atty., of Mt. Vernon, Ky., and Homer B. Parrent, Enforcement Atty., of Louisville, Ky., for plaintiff.

Allen P. Dodd and John Skaggs, Jr., both of Louisville, Ky., for defendants A. J. Cummins and others.

J. V. Norman and Davis R. Castleman, both of Louisville, Ky., for defendant Roy St. Lewis.

Irvin Marcus and Davis, Boehl, Viser & Marcus, all of Louisville, Ky., for defendant Earl J. Mock.

Curtis & Curtis, of Louisville, Ky., for defendant Mrs. Marcellius G. Mature.

J. Verser Conner, of Louisville, Ky., and Frederic P. Lee and Floyd F. Toomey, both of Washington, D.C., for defendant Adolph Hirsch.

MILLER, District Judge.

The plaintiff as Price Administrator, Office of Price Administration, brought

this action on behalf of the United States, pursuant to the provisions of Section 205(e) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 925(e), against the defendants Cummins Distilleries Corporation and its individual stockholders to recover $6,799,101.57 as treble damages for the sales of 51,694 barrels of Bourbon whiskey at prices in excess of the maximum price established therefor by Maximum Price Regulations. A number of the defendants have filed motions for summary judgment, and by answers have also pleaded that the complaint fails to state a cause of action against them. The motions and such paragraphs of the answers raise similar questions and will accordingly be considered together.

The complaint alleges that the Cummins Distilleries Corporation was a Delaware corporation doing business in Kentucky with its principal office in Louisville, Kentucky, and was engaged in the business of selling whiskey in bulk and whiskey and gin in cases; that on December 31, 1942 it was dissolved; that on or about January 4, 1943 the corporation, or its officers, or its directors, or a stockholders' distribution committee, or the stockholders themselves sold to various purchasers 51,694 barrels of Bourbon whiskey at prices which were in excess of Maximum Price Regulation No. 193 in the amount of $2,266,367.19. Judgment is prayed against each of the defendants for treble this amount, as authorized by Section 205(e) of the Act. Verified answers add the additional undisputed facts that on or about October 1, 1942 the Cummins Distilleries Corporation was required by the United States to discontinue the manufacture of alcoholic beverages and to manufacture in its place alcohol for the United States Government; that continuously from October 1, 1942 up to the date of its dissolution it produced alcohol for the United States Government exclusively; that it had a stock of whiskey on hand that could possibly last 3½ years at the most, and being unable to replenish its stock it was the opinion of its board of directors that it was impossible for the distillery to continue in business at a profit to its stockholders; that accordingly on December 24, 1942 the stockholders voted to dissolve the corporation and proceedings were instituted and carried through in good faith to that end; that the whiskey on hand represented by warehouse receipts therefor was distributed in kind to the stockholders through delivery to an authorized stockholders' committee, which committee thereafter sold the warehouse receipts to the purchasers referred to in the complaint. The answers also plead in defense that the warehouse receipts were negotiable instruments and not "commodities" as that term is used and defined in the Emergency Price Control Act, and were in fact "securities" which were expressly exempt from the application of Maximum Price Schedules; that there was not at the time of the alleged sales any valid maximum price applicable to the sale of negotiable warehouse receipts or of whiskey in bulk; that the alcoholic beverages produced by the distilleries corporation were manufactured exclusively from agricultural products and as such were not covered by Maximum Price Regulation No. 193 relied upon by the plaintiff; that there was no maximum ceiling price for bulk whiskey in bond until February 3, 1943 which was subsequent to the date of the alleged sales; and that said sales were made in good faith and in the belief that they were not violations of any provisions of the Act or of any price schedule.

The Emergency Price Control Act of 1942 was approved January 30, 1942, 50 U.S.C.A.Appendix §§ 901 through 946. It in itself established no ceiling prices but vested in the Price Administrator broad discretionary authority to fix ceiling prices on such "commodities," as he might select.

Section 302 dealing with definitions provides "The term 'commodity' means commodities, articles, products, and materials (except materials furnished for publication by any press association or feature service, books, magazines, motion pictures, periodicals and newspapers, other than as waste or scrap), and it also includes services rendered otherwise than as an employee in connection with the processing, distribution, storage, installation, repair, or negotiation of purchases or sales of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity: * * *." By Section 3(c) of the Act it is provided that "no maximum price shall be established or maintained for any commodity processed or manufactured in whole or substantial part for any agricultural commodity below a price which will reflect to producers of such agricultural commodity a price for such agricultural commodity equal to the highest price therefor specified in subsection (a)." Subsection (a) of Section 3 provides that no maxi-

mum price shall be established for any agricultural commodity below a certain level determined in several ways, including 110 percentum of the parity price for such commodity, the market price prevailing for such commodity on certain dates, and the average price for such commodity during a designated period of 10 years. The Act also created by Section 204 thereof the Emergency Court of Appeals with exclusive jurisdiction to determine the validity of any regulation or order or price schedule issued under the Act, with appeal from its judgments to the Supreme Court of the United States.

On April 28, 1942 the Price Administrator issued "General Maximum Price Regulation—Bulletin No. 1." In Section 2 of this Regulation he established maximum prices "for any commodity or service" at the highest price charged by the seller during the month of March 1942. Section 9 of this Regulation excepted certain commodities from its operation, including in Subsection 15 thereof "Securities." By Section 20, dealing with definitions and explanations it was provided in Subsection (q) that "'Securities' includes any note, stock, bond, and interest or instrument commonly known as a 'security'".

On August 1, 1942 the Administrator issued Maximum Price Regulation No. 193, effective August 5, 1942, which by its title dealt with "domestic distilled spirits," and which in its opening paragraph stated that in the judgment of the Price Administrator it was necessary to establish maximum prices for the sale of domestic distilled spirits because (a) the allocation of all neutral spirits to war industries had forced blenders of liquors to use higher priced high wines and (b) it was proposed to increase the Federal excise tax on distilled spirits. This Regulation provided "On or after August 5, 1942, regardless of any contract, agreement, lease or other obligation, no person shall sell or deliver domestic distilled spirits and no person in the course of trade or business shall buy or receive domestic distilled spirits at prices higher than the maximum prices set forth in Appendix (a) hereof * * *; and no person shall agree, offer, solicit, or attempt to do any of the foregoing." Appendix (a) provided that "the seller's maximum price for domestic distilled spirits shall be the seller's maximum price established under Section 1499.2(a) of the General Maximum Price Regulation, plus the following additions: * * *." The additions allowed manufac-

turers, and also sellers other than manufacturers, to add certain costs and taxes, and Appendix (a) then further provided that "If the seller's maximum price for the domestic distilled spirits to be priced can not be determined" in that way it should be established by taking the maximum price for the most closely competitive seller of the same class for such domestic distilled spirits or for the similar commodity most nearly like it, or if this was not possible it should be determined in accordance with Section 1499.3 of the General Maximum Price Regulation. On November 2, 1942 the Administrator issued Maximum Price Regulation 193 Amendment 1 and Maximum Price Regulation 193 Amendment 2; on December 1, 1942 the Administrator issued Maximum Price Regulation 193 Amendment 3; and on February 3, 1943 the Administrator issued Maximum Price Regulation 193 Amendment 4. All of these carried the title of "Domestic Distilled Spirits." Amendments 1, 2 and 3 dealt with matters not important to this litigation. Amendment 4 dealt specifically with Domestic Bulk Whiskey," and "Warehouse Receipt." A new paragraph, designated Paragraph (e), was added which provided in part as follows: "The seller's maximum prices for sales of domestic bulk whiskey in bond by transfer of warehouse receipt or other evidence of title, or otherwise, shall be the maximum prices set forth in Paragraph (g) in accordance with the age of such whiskey to be priced hereunder."

Paragraph (9), also newly added to the Regulation, gave a specific dollar and cent maximum price of original proof gallon according to the age of the whiskey as set forth in the schedule. It will be noticed that Maximum Price Regulation 193 became effective August 5, 1942, which was prior to the dates of the sales herein complained of; that Amendments 1, 2 and 3 were all issued prior to the dates of the sales herein complained of; but that Amendment No. 4 dealing specifically with domestic bulk whiskey and warehouse receipts and fixing specific dollar and cent ceiling prices for the same was not issued until February 3, 1943, which was after the date of the sales herein complained of.

The complaint alleges that the defendants sold "barrels of Bourbon whiskey." However, on the motion for summary judgment the facts are shown to be undisputed that the sales complained of con-

sisted of the transfer by the sellers to the purchasers of warehouse receipts representing barrels of Bourbon whiskey stored in Kentucky warehouses. Section 4770 of Carroll's Kentucky Statutes, 1936 Edition, provides "All receipts issued by any warehousemen as provided by this chapter shall be negotiable and transferable by endorsement in blank, or by special endorsement, and with like liability as bills of exchange now are, and with like remedy thereon." Several of the defendants' contentions are based upon this feature of the case, namely, that such warehouse receipts issued under the Kentucky Statutes were negotiable instruments. It is therefore contended that the sale of such negotiable instruments was not the sale of "commodities" to which the maximum price schedule is limited, but was in fact the sale of "securities," which are exempted from maximum price schedules by "General Maximum Price Regulation— Bulletin No. 1", referred to hereinabove; and that no maximum price schedule referred to warehouse receipts or to whiskey in bulk until Amendment No. 4 was issued on February 3, 1943. The negotiable character of warehouse receipts issued by Kentucky warehousemen is well established in Kentucky, and is apparently not contested by the plaintiff. Flexner v. Meyer's Ex'x, 191 Ky. 133, 229 S.W. 99; Stitzel-Weller Distillery v. Norman, D.C.W.D.Ky., 39 F.Supp. 182; T. J. Pendergast Wholesale Liquor Co. v. Lancaster-Bennett Co.,[1] D.C.W.D.Ky., Louisville Division, Snedden, Adm'r v. Shawhan Distillery Co.,[1] D.C.W. D.Ky., Louisville Division. But the fact of negotiability is not decisive of the question of whether or not such warehouse receipts are "securities." While most securities have the quality of negotiability in them, yet in many instances they are not negotiable instruments. Negotiability is accordingly merely one factor to be considered along with other factors in the case. The word "securities" in its general sense means evidences of debt. It is ordinarily used as a synonym for investments which usually means the putting out of money on interest either by loans or by the purchase of income producing property. Generically, the word has reference to written instruments, usually providing for the payment of money, and usually carries with it the idea of being issued and used for the purpose of financing enterprises and promoting a distribution of rights in such enterprises. United States v. American Trust & Banking Co., 6 Cir., 125 F.2d 113, 115; Genessee Trustee Corp. v. Smith, 6 Cir., 102 F.2d 125, 127; Commissioner v. Tyng, 2 Cir., 106 F.2d 55, 59; see also Oklahoma-Texas Trust v. Securities and Exchange Commission, 10 Cir., 100 F.2d 888, 890; Mutual Bankers Company v. Terrell, 130 Fla. 583, 178 So. 399. One definition of the term "security", which has apparently received high judicial approval, is "the investment of money with the expectation of profit through the efforts of other persons." Securities and Exchange Commission v. Universal Service Ass'n, 7 Cir., 106 F.2d 232, 237. The essential idea contained in this definition has been heretofore approved by this court in Securities and Exchange Commission v. Bourbon Sales Corp., D.C.W.D.Ky., 47 F.Supp. 70, 72. Tested by the foregoing rules warehouse receipts for whiskey stored in a bonded warehouse are not securities in the usually accepted meaning of the term. They are not evidences of debt; they do not call for the repayment of money; they are not investments; the warehouseman who issues the receipt in exchange for the property has offered no economic inducement to the one transferring to him the property (even if we consider property in such a case the equivalent of money), which element is stressed as fundamental in a "security" in the recent opinion by the Supreme Court in Securities & Exchange Commission v. C. M. Joiner Leasing Corporation, 64 S.Ct. 120, 88 L.Ed. ——. On the contrary, they are what the term implies, namely, receipts; they acknowledge the receipt by the warehouseman of specific property and contain the warehouseman's contract to hold that property and return the identical property to the owner on demand. In a transaction involving the issuance of a security the obligor has the right to use the money entrusted to him by the obligee; a warehouseman, on the contrary, does not have the right to use the property entrusted to his possession, but instead has the obligation to preserve and protect the property and return it in its original shape, except as changed by lapse of time. In a transaction involving the issuance of securities, the obligor often has to pay interest for the use of the money entrusted to him, or when conditions justify it pays dividends to the obligee for such use. A warehouseman pays nothing to the owner of the property

---

[1] No opinion for publication.

entrusted to him, but on the contrary receives compensation from such owner for the services rendered to the owner. The two transactions are accordingly essentially different. The fact that a warehouse receipt may be negotiable does not destroy the fact that it is primarily a receipt for the redelivery of specific property described therein, embodying none of the characteristics of a loan or investment of money. The contention of the defendants that the warehouse receipts in question were securities exempted from the provision of the Act is not supported by the authorities and principles above referred to.

I am also unable to agree with defendants' contention that the sales in question were not sales of "commodities" covered by the Act, but were sales of warehouse receipts, which are not commodities, and which were not covered by any price regulation until February 3, 1943. When we give full effect to the quality and effect of a warehouse receipt it is obvious that the sale of such an instrument is in reality the sale of the article covered by that instrument rather than the sale of the instrument itself. The warehouse receipt has no intrinsic value and is of value only because of what it represents and what its presentation and demand on the part of the purchaser can produce. It should be clear to any one considering the transaction in its true nature that the stockholders were in reality selling the whiskey which they owned, and that the purchasers were buying whiskey rather than pieces of printed paper. The nature of the distillery business, and the Government regulation thereof, makes it necessary that in order to sell whiskey in bulk in a bonded warehouse certain title papers must be transferred from the seller to the buyer evidencing the transfer of title. But such procedure in no way destroys the fundamental nature of the transaction, namely, the sale and purchase of the physical property which the receipts represent. Real estate is sold and transferred by the execution and delivery of a deed from the vendor to the vendee; yet no one would seriously contend that in such a transaction the vendor was selling a deed instead of selling real estate. Likewise when a person is acquiring a lien interest against either personal property such as an automobile or radio, or in real estate, he transfers his money for the execution and delivery to him of an instrument of mortgage without the physical possession of the property being disturbed in any way; yet no one reasonably contends that such a purchaser is buying merely a piece of paper rather than a lien interest in either the real or personal property under consideration. The question therefore is whether or not in reality the whiskey which was sold in the present case by means of the transfer of the warehouse receipts representing the whiskey, was a commodity within the provisions of the Emergency Price Control Act. The definition of the term "commodity" as given in Section 302 of the Act and referred to hereinabove is a very broad one, including "articles" and "products". Webster's New International Dictionary, 1940 Edition, defines product as "anything produced, as by generation, growth, labor, or thought, or by the operation of involuntary causes; as, the products of the season or of the farm; the products of the brain; he is a finished product." Whiskey, manufactured from grain by the use of labor, falls within this broad definition. This construction of the term is supported by another Section of the Act itself and by the provisions of the General Maximum Price Regulation—Bulletin No. 1 issued on April 28, 1942. The Act itself, after giving this broad definition, proceeds by Section 3 thereof to restrict its application in certain ways to agricultural commodities and commodities processed or manufactured in whole or in substantial part from any agricultural commodity. Section 9 of General Maximum Price Regulation—Bulletin No. 1 specifically exempts 16 different commodities and 9 separate types of transactions from price regulation. But neither in the Act itself nor in the General Maximum Price Regulation is whiskey exempted from the operation of the Act and the regulations thereunder. When we observe that the exemptions above referred to include such articles as leaf tobacco, nuts, stamps and coins, precious stones, antiques and knotted oriental rugs, paintings, etchings, sculptures and other objects of art, used automobiles, magazines, motion pictures and securities, it is difficult to believe that whiskey was omitted from such exemptions inadvertently. The reasonable deduction is that the failure to include it within such varied and nonessential exempted articles is that it was the purpose to include whiskey among the articles and products subject to price regulation.

Defendants further contend that the sales in question, even though con-

strued as sales of whiskey, are not subject to the Act because Section 3 thereof restricts in the way provided therein the establishment of a maximum price for any commodity processed or manufactured in whole or substantial part from any agricultural commodity, as referred to hereinabove. It is pointed out that whiskey is processed or manufactured from an agricultural commodity and that the Regulation in question does not establish for whiskey in bulk a maximum price according to the formula provided by the Act. This may be true, but it does not follow that a maximum price for whiskey was not established by the Regulation, although reached by an incorrect or invalid procedure. Undoubtedly this court has the right to construe the regulation in order to determine its scope, but after the court, in so doing, construes the regulation as applicable to sales of whiskey in bulk, it has no further jurisdiction to adjudge the regulation invalid. Section 204 of the Emergency Price Control Act creates the Emergency Court of Appeals as hereinabove referred to, and provides in Subsection (d) thereof "Except as provided in this section, no court, Federal, State or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule * * * or set aside, in whole or in part * * * any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision." The constitutionality of the Emergency Price Control Act of 1942 as a whole, and validity of this section conferring exclusive original jurisdiction upon the Emergency Court of Appeals, have been upheld several times by rulings of both District Courts and United States Circuit Court of Appeals. Rottenberg v. United States, 1 Cir., 137 F.2d 850; Henderson v. Burd, 2 Cir., 133 F.2d 515, 146 A.L.R. 714; Taylor v. Brown, Em.App., 137 F.2d 654; Henderson v. Kimmel, D.C., 47 F.Supp. 635; Dieffenbaugh v. Cook, D.C., 47 F. Supp. 645; United States v. J. Slobodkin, D.C., 48 F.Supp. 913; United States v. C. Thomas Stores, D.C., 49 F.Supp. 111. See also United States v. Macintosh, 283 U.S. 605, 622, 51 S.Ct. 570, 75 L.Ed. 1302; Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L. Ed. 865, 16 A.L.R. 165; Kline v. Burke Const. Co., 260 U.S. 226, 233, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077; Highland v. Russell Car & Snow Plow Co., 279 U.S. 253, 49 S.Ct. 314, 73 L.Ed. 688; Myers v. Bethlehem Ship Building Corp., 303 U.S. 41, 50, 51, 58 S.Ct. 459, 82 L.Ed. 638. The foregoing opinions contain a complete discussion and analysis of the question involved which it is unnecessary to repeat in this opinion. In accordance with the views expressed therein the court holds that Section 204 of the Act is constitutional and binding upon this court which deprives this court of jurisdiction to consider the validity of the Regulation which the defendants are attacking herein.

Considerable stress is placed by the defendants upon the fact that Amendment No. 4 to Maximum Price Regulation 193, effective February 3, 1943, was the first time in which any maximum price regulation dealt specifically with warehouse receipts or with the sale of domestic bulk whiskey in bond. It is urged upon the court that this was an admission by the Office of Price Administration that its previous regulations did not cover such transactions, and that such contemporaneous construction by the Office of Price Administration should be adopted by the court. If this view is accepted it follows that there was no maximum price established for domestic bulk whiskey in bond being transferred by the sale of warehouse receipts at the time when the sales complained of occurred. This contention has considerable merit. I do not believe, however, that Amendment No. 4 has quite the effect attributed to it by defendants. Their contention would have more weight if the provision concerning warehouse receipts was not coupled with the fact that at the same time a definite dollar and cent ceiling price was placed on whiskey in bulk according to its age. Maximum Price Regulation 193, effective August 5, 1942, deals specifically with "Domestic Distilled Spirits." It carries that sub-title, and the opening paragraph states "In the judgment of the Price Administrator, it is necessary to establish maximum prices for the sale of domestic distilled spirits * * *." Paragraph 1420.1 provides that "* * * No person in the course of trade or business shall buy or receive domestic distilled spirits at prices higher than the maximum price set forth in Appendix A hereof, * * *." Nowhere in the Regulation is the phrase "Domestic Distilled Spirits" restricted to sales at retail. The broad general term is used throughout the Regulation, which contains nothing in itself which would indicate any intention to

draw a distinction between sales at retail and sales in bulk. The phrase is certainly broad enough and plain enough in its wording to include domestic distilled spirits of all kinds, whether bottled or in bond. If Amendment No. 4 had not been issued at a later time the Regulation would have been applicable to the sales herein referred to, using the construction which has been hereinabove given to the Act and the Regulations. Amendment Nos. 1, 2, 3 and 4 all carry the same sub-title of "Domestic Distilled Spirits," each dealing with a different phase of the same general subject. Amendment No. 4 makes a material change in the manner of fixing the maximum price for domestic whiskey in bulk by setting a dollar and cent price for this type of whiskey according to its age. It did not attempt to make such a dollar and cent maximum price applicable to all domestic distilled spirits, but left the existing regulations unchanged as to all domestic distilled spirits excepting domestic whiskey in bulk. It seems to me that the Administrator's action in issuing Amendment No. 4 is just as consistent with the purpose that "domestic distilled spirits" in general should be subdivided into whiskey in bulk and whiskey not in bulk with a new and different method for fixing the maximum price on whiskey in bulk, as it is with the defendants' contention that it admits that whiskey in bulk was not included in the previous regulations. This view is supported by the "Statement of The Considerations involved in the issuance of Amendment No. 4 to Maximum Price Regulation No. 193", which states in part "The Price Administrator has recently completed a study of the market for sales of domestic whiskey in bulk and, upon the basis thereof, has concluded that it is necessary to adjust the maximum prices now established under Maximum Price Regulation No. 193 for this commodity * * *. Because, however, prices in the market are not posted, and because the shortage of the commodity has made necessary the prevention of inflationary activities, dollars and cents prices are fixed in accordance with the results of the Administrator's study." It will be noticed that according to this Statement of Considerations Amendment No. 4 was issued "to adjust the maximum price now established." Accordingly, this was not an admission by the Administrator that original ceiling prices were being established for a new commodity, but on the contrary a statement by him that old prices for the same commodity were merely being adjusted to better meet conditions disclosed by a recent study. I believe this Statement of Considerations by the Administrator, issued contemporaneously with the release of Amendment No. 4 is entitled to consideration by the court when at a later time in a dispute subsequently arising, the purpose of the Amendment is brought into question. When, as in this case, it supports a construction of the Amendment which appears to the court just as logical as the one advanced by the defendants, it should no doubt prove the deciding factor in the decision. Compare: United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Overnight Motor Transp. Co. v. Missel, 316 U. S. 572, on pages 580 and 581, 62 S.Ct. 1216, on pages 1221, 1222, 86 L.Ed. 1682, Note 17; Noble v. United States, 319 U.S. 88, on page 93, 63 S.Ct. 950, on page 952, 87 L.Ed. 1277, Note 4; Bumpus v. Continental Baking Co., 6 Cir., 124 F.2d 549, 552, 140 A.L.R. 1258. The court accordingly rules that Amendment No. 4 did not for the first time establish a maximum price for whiskey in bulk but merely changed the method previously used and adjusted the maximum prices previously established in accordance with such new method.

■ The defendants further present as a defense herein the contention that the sales were made in good faith and without any intent on their part to violate any existing maximum price schedule. The Act does not restrict liability to willful violations thereof. Section 4 makes it unlawful "for any person to sell or deliver any commodity * * * in violation of * * * any price schedule * * *." Section 205(e) of the Act provides for the cause of action herein claimed by the plaintiff "if any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price * * *." Section 205(b) of the Act imposes criminal penalties for the willful violation of the provisions of the Act or Regulations. The distinction between civil proceedings and criminal proceedings appears plain. In addition, the defendants' contention has been rejected by Circuit Courts of Appeals in the following cases: Brown, Adm'r, v. Hecht Co., App. D.C., 137 F.2d 689, 691; Bowles, Adm'r, v. American Stores, Inc., App.D.C., 139 F. 2d 377.

■ The plaintiff has moved to strike Paragraphs III, IV, V, VI and VII from

the answer of the defendant A. J. Cummins and from the answer of each defendant who in his pleading has adopted as a part of his answer such paragraphs of the answer of the defendant A. J. Cummins. These paragraphs of the answer present for the most part the questions of law which have been discussed and ruled upon hereinabove, and to that extent are considered by the court as insufficient defenses to the cause of action alleged in the complaint. However, in some respects they contain additional allegations of fact, which if sustained by the evidence might present a defense not hereinabove discussed. In Paragraph III the defendants claim that the dissolution of the Cummins Distilleries Corporation was a good faith liquidation of the corporation, by virtue of which title to the warehouse receipts was completely vested in the stockholders of the corporation, and that the defendant making the answer "had nothing to do with the disposition of any one of the warehouse receipts so distributed." Paragraph IV alleges that alcoholic beverages are commodities manufactured exclusively from agricultural products, but that Bourbon whiskey is a distinct commodity wholly different from other alcoholic beverages and not covered by the regulations; and that paragraph further alleges that the Price Administrator advised the stockholders of the Cummins Distilleries Corporation that there was no maximum price on warehouse receipts, which construction was adopted and acted upon both by the Price Administrator and brokers dealing in such receipts prior to February 3, 1943 when Amendment No. 4 was issued. Paragraph V alleges that it was impossible for the ordinary citizen to procure a copy of the regulations from any authorized source except as printed in the newspapers; that application was made to the local Office of Price Administrator without avail; that reliance therefore had to be placed upon newspaper articles, which the defendants did to the best of their ability. Paragraph VI alleges that application was made through the Department of Revenue of Kentucky to the authorities at Washington for a ruling as to the possible conflict between the Fair Trade Act of Kentucky and the Price Control Act with reference to whiskey, and after the adoption of Maximum Price Regulation No. 193 a ruling was obtained from the Regional Office of the Price Administrator at Cleveland, Ohio, which advised that the regulation did not have any application to straight whiskeys, and that by reason of said facts the plaintiff is estopped to claim that the warehouse receipts under consideration were sold in violation of any regulation. Paragraph VII adopts all of the allegations contained in Paragraphs I through VI of the complaint and alleges that the warehouse receipts so sold were negotiable instruments and were not commodities. These paragraphs are accordingly linked together to a large extent in setting up, in addition to the questions of law hereinabove discussed, the defenses of estoppel against the plaintiff and what participation, if any, each individual defendant had in the sale of the receipts. There is also pending in this Division Action No. 541 in which the Louisville Trust Company as complainant seeks a declaration of rights with respect to $1,053,743.60 which it holds as the balance of an original deposit of $3,000,000 made with it by the Stockholders' Committee of the Cummins Distilleries Corporation, which received this sum for the sale by it of the warehouse receipts in question. The original deposit was reduced to this amount by reason of a portion of the stockholders having cashed their checks distributed to them as their proportionate interest in the warehouse receipts so sold. This remaining portion of the deposit was frozen with the Trust Company when Seldon R. Glenn, Collector of Internal Revenue for the Western District of Kentucky, gave notice to the Trust Company of a jeopardy assessment of income tax against Cummins Distilleries Corporation in the sum of $1,500,000 and attached said balance on deposit as the property of the Corporation. The deficiency assessment is based upon the contention that as a matter of law the sale of the warehouse receipts and the profit realized therefrom was made by the Cummins Distilleries Corporation. The present action (No. 584) filed by the Price Administrator charges that these same sales were made by the stockholders. The answers herein raise questions common to both actions, arising out of the same facts. Accordingly, the two cases are necessarily involved one with the other and should be disposed of by final judgments which take into consideration the claims of all parties in both suits. In order to preserve the opportunity of such joint consideration of the two actions, the motions of the plaintiff in this action to strike from the answers are overruled.

In accordance with the views hereinabove indicated, the motions for summary

judgment and the motions to dismiss the complaint made by the various defendants are overruled. Counsel for plaintiff will draft and tender for entry the appropriate order giving effect to the rulings herein.