**UNITED STATES v. HUTCHINSON.**

**SAME v. ROCKWELL.**

**SAME v. ROODENKO.**

**SAME v. WHITE.**

**Nos. 10158, 10159, 10161, 10160.**

District Court. D. Colorado.

May 8, 1944.

Thomas J. Morrissey, U. S. Atty., and Joseph E. Newman, Asst. U. S. Atty., both of Denver, Colo., for plaintiff.

Carle Whitehead and Arthur A. Brooks, Jr., both of Denver, Colo., for defendants.

KENNEDY, District Judge.

The above entitled causes comprise four separate and distinct indictments charging the defendants with violation of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix § 301 et seq., the specific charge in two of such indictments being that the defendants failed to return to C. P. S. Camp No. 111 at the expiration of a furlough; in one that the defendant deserted said camp and in the other that the defendant failed to work and perform duties assigned to him at said camp. The charges are therefore brought within the general scope of the Act as to the alleged violations of regulations prescribed thereunder and the penalizing section. In three of the cases demurrers to the indictments were filed but not in the fourth. When the cases were called for trial a jury was waived by the several defendants and a trial to the Court was stipulated. Pleas of not guilty in all cases were interposed and it was agreed by counsel that the matter of hearing upon the demurrers would be reserved until the cases could be tried upon the merits and with other defenses that they should be consolidated for the purpose of consideration by the Court upon oral argument or the filing of trial briefs. At the close of the evidence motions for discharge of the defendants were severally interposed. The defendants were released upon their bonds given at the time of arrest, until such time as the Court should make its final decision. Such trial briefs have been submitted and given consideration.

The facts in the case are comparatively simple and not seriously in dispute. Briefly stated they are that the defendants were classified under the Selective Service Act as "conscientious objectors", placed in the appropriate classification of IV–E, subsequently assigned through intermediate transfers to the Civilian Public Service Camp No. 111, located at Mancos, Colorado, and after being transferred to said camp they were subjects thereof and subsequently refused to obey the orders issued in connection with said camp in the manner charged in said indictments.

C. P. S. Camp No. 111 was established by Lewis B. Hershey, Director of Selective Service System under an Executive Order by the President of the United States, asserted to be authorized by the Selective Service Act. General Hershey is an officer of the United States Army and he has as his assistants other Army officers consisting principally of Lewis F. Kosch, designated as Chief of Camp Operations Division and Colonel McLean, in charge of official inspection of such camps. These officials, in performing their duties under the Selective Service System, wear their regular Army uniforms and receive their compensation from the military branch of the government. The camp itself is in charge of a civilian camp director employed by the United States Reclamation Service and work to be performed by said director and the persons assigned to said camp is the preparation for and construction of an irrigation project under the Federal Reclamation Laws. The work in said camp is immediately under the direction of said camp director so far as the physical operations upon the project are concerned and the general welfare of the persons assigned to said camp as to hours of service, discipline, compensation and the like are controlled by regulations prescribed under the Selective Service System. Without going too much into detail this brief outline sufficiently presents the picture for a consideration of the questions here involved.

Under the several legal defenses here invoked by the defendants it is principally claimed that said Act is in excess of the Constitutional power of Congress; that the attempted power exercised is outside the expressed purpose of the Act;

that it is in excess of the army-raising power of Congress limited in the Act itself; that it is an unconstitutional condition and limitation attempted to be attached to the enjoyment of a valid exemption from induction; and that in any event the camp as so established is in violation of the Act of Congress in that it is under military and not civilian control.

Perhaps not all of the diversified contentions of counsel for defendants have been expressed in the foregoing outline, but enough has been stated it would seem to warrant the conclusion that every available plea in favor of said defendants and against the determination of their guilt has been presented.

Many legal controversies have arisen out of the Selective Service Act of 1940 as to the constitutional rights of conscientious objectors and these have flooded the Federal Trial Courts with litigation. The duty of the Trial Courts in connection with accused conscientious objectors as to induction was in doubt and those Courts were left in a state of uncertainty until finally in Falbo v. United States, 320 U.S. 209, 63 S.Ct. 1448, 87 L.Ed. 1848, the rule was laid down to the effect that Congress had delegated the matter of selection and classification to the various Draft Boards, whose decision subject to the right of appeal to established Boards, was final. The present attack upon the Act is perhaps along a different legal line although related in some respects to the case which has just been mentioned, and I apprehend that the same doubt and uncertainty will surround this class of cases until the High Court has again spoken and cleared the legal atmosphere concerning the rights of conscientious objectors. Several of the lower and intermediate Federal Courts have spoken in cases akin to these under consideration, although perhaps differing somewhat in detail as to facts or contentions, but insofar as this Court is concerned, I shall leave the legalistic technique for the expression of the Court of last resort in the treatment of the points involved which may bring forth divergent views there and content myself with a brief outline of my own views without attempting to support them by reference to adjudicated cases in the lower Courts.

 It occurs to me that the best approach to a discussion of the matter here involved is laid down in the opinion of Mr. Justice Sutherland in United States v. Mac-intosh, 283 U.S., 605, at page 622, 51 S. Ct. 570, 574, 75 L.Ed. 1302, where he says:

"From its very nature the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams, 'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press curtailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; prices of food and other necessities of life fixed or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war.

"These are but illustrations of the breadth of the power; and it necessarily results from their consideration that whether any citizen shall be exempt from serving in the armed forces of the nation in time of war is dependent upon the will of Congress and not upon the scruples of the individual, except as Congress provides. That body, thus far, has seen fit, by express enactment, to relieve from the obligation of armed service those persons who belong to the class known as conscientious objectors; and this policy is of such long standing that it is thought by some to be beyond the possibility of alteration. Indeed, it seems to be assumed in this case that the privilege is one that Congress itself is powerless to take away. Thus it is said in the carefully prepared brief of respondent:

" 'To demand from an alien who desires to be naturalized an unqualified promise to bear arms in every war that may be declared, despite the fact that he may have conscientious religious scruples

against doing so in some hypothetical future war, would mean that such an alien would come into our citizenry on an unequal footing with the native born, and that he would be forced, as the price of citizenship, to forego a privilege enjoyed by others. That is the manifest result of the fixed principle of our Constitution, zealously guarded by our laws, that a citizen cannot be forced and need not bear arms in a war if he has conscientious religious scruples against doing so.'

"This, if it means what it seems to say, is an astonishing statement. Of course, there is no such principle of the Constitution, fixed or otherwise. The conscientious objector is relieved from the obligation to bear arms in obedience to no constitutional provision, express or implied; but because, and only because, it has accorded with the policy of Congress thus to relieve him. The alien, when he becomes a naturalized citizen, acquires, with one exception, every right possessed under the Constitution by those citizens who are native-born (Luria v. United States, 231 U.S. 9, 22, 34 S.Ct. 10, 58 L.Ed. 101); but he acquires no more. The privilege of the native-born conscientious objector to avoid bearing arms comes, not from the Constitution, but from the acts of Congress. That body may grant or withhold the exemption as in its wisdom it sees fit; and, if it be withheld, the native-born conscientious objector cannot successfully assert the privilege. No other conclusion is compatible with the well-nigh limitless extent of the war powers as above illustrated, which include, by necessary implication, the power, in the last extremity, to compel the armed service of any citizen in the land, without regard to his objections or his views in respect of the justice or morality of the particular war or of war in general."

█ The significance of this expression accentuates the fact that the Congress is all-powerful in fixing the duties of its citizens in defense service in time of war and that the matter of exemption from military service comes not from the Constitution but from the acts of Congress. Any lesser degree of authority in power ascribed to the Congress in time of war would render the Nation impotent to provide for its common defense and protect itself against the common enemy. In the Selective Service Act of 1940 the Congress proceeded to establish certain classifications for exemption and made special pro-

visions for the treatment of conscientious objectors, which are found in 50 U.S.C.A. Appendix § 305(g), section 5(g) of the Act:

"Nothing contained in this Act shall be construed to require any person to be subject to combatant training and service in the land or naval forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Any such person claiming such exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the land or naval forces under this Act, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, in lieu of such induction, be assigned to work of national importance under civilian direction."

This section further provides the method by which appeals may be had and then adds:

"Each person whose claim for exemption from combatant training and service because of conscientious objections is sustained shall be listed by the local board on a register of conscientious objectors."

It seems to me that by this provision the Congress has exercised its inherent power to provide for the handling of conscientious objectors and has attempted to be lenient with those indulging a religious belief against military service and to permit them to be handled and treated in a different manner. This must be considered as a concession on the part of the Congress because it would be within its power to exempt no person from military service should it so determine that the welfare of the country required every person to serve it in such capacity in a time of national peril. Certainly it could not be said under these circumstances that Congress was without the power to treat conscientious objectors in a more lenient manner than they might have treated them by requiring them to serve in the military forces in time of war.

█ The remaining point to be considered is as to whether or not in the setup for civilian camps of which the defendants complain, committed by the Act to the President as Commander-in-Chief of the military forces in time of war, the Statute has been substantially followed.

The defendants complain, as I understand, principally that the camp to which they have been assigned does not involve work of national importance and is not under civilian direction in accordance with the terms of the Act. The work of national importance here designated is under the Reclamation Service and involves a program which is authorized by national law and is therefore entitled to be classified as work of national importance. As to whether or not the camp is under civilian direction perhaps there may be a more arguable point. It is under civilian direction so far as the work to be performed is concerned but the Selective Service System retains control over the conduct, general welfare and social treatment of the assignees sent to such camp. This, it is true, is a limitation upon the absolute freedom of conduct of such assignees but regardless of the fact that certain men of the army are detailed by executive order to make rules and regulations governing the general conduct of the assignees, it still does not reach the point of making the work of a military character or its direction of a military character. The work itself to be performed is essentially nonmilitary being neither of a combative nor a non-combative type and is under the direction of a civilian. The assignees are not placed in uniform, they are not assigned any duties bordering on a military nature and generally speaking they remain subject to civil authority where infractions of the regulations are charged. These cases are living examples of the defendants being prosecuted in the civil Courts rather than through the military establishment by Court Martial. As I view the evidence in these cases, it is sufficient upon which to base a conclusion that in the essential characteristics the camp in question is under civilian direction.

In this expression of views I shall not attempt to add to the legal literature which is again pressing the Courts on this new phase of the Selective Service Act, but only add my conclusions so that the cases may be expedited to a decision of the higher Courts, for the reason that very probably until the Supreme Court has again spoken the questions here involved may be considered as somewhat shrouded in doubt.

I yield to no man in my feeling that a person has the absolute right to his own religious beliefs, but when such beliefs come into conflict with the duty of a citizen to his country in time of war, there must be some logical point along the road where religious or other forms of belief must in some respect yield to the superior duty of preserving the nation. In this we must submit to the will of the majority, which is better than being subject to the will of the autocrat or dictator, because in our system the avenue is always open to an opponent to put his own views across.

For the reasons stated the several demurrers and motions to dismiss on the part of the defendants will be overruled and the defendants will be adjudged to be guilty as charged in the several indictments. At a time later to be fixed the defendants will be ordered to appear for the entry of an appropriate judgment.