Laurence C. **BALDAUF**, Jr., Plaintiff,

v.

Paul **NITZE**, Secretary of the Navy, Defendant.

Civ. No. 3518.

United States District Court
S. D. California.

Nov. 3, 1966.

Daniel B. Hunter, Mizeur, Leeger & Hunter, San Diego, Cal., for plaintiff.

Edwin L. Miller, Jr., U. S. Atty., Southern Dist. of California, J. William Doolittle, Acting Asst. Atty. Gen., Civil Div., U. S. Dept. of Justice, Washington, D.C., by Fred W. Drogula, Atty., Litigation Section, for defendant.

## MEMORANDUM OF DECISION

KUNZEL, District Judge.

Both parties have filed motions for summary judgment upon which a hearing has been held.

Plaintiff alleges his cause of action arises under U.S.Const. amend. XIII, § 1, in that the defendant, by refusing to accept plaintiff's resignation from the United States Navy, imposes upon plaintiff "involuntary servitude."

Defendant asserts that this court does not have jurisdiction in that his acts were purely discretionary. However, where there is a substantial claim that prescribed military procedure violates one's constitutional rights, the district court has jurisdiction to resolve the constitutional question. Reed v. Franke, 297 F.2d 17, 20 (4th Cir. 1961).

At the time the complaint was filed, plaintiff sought a temporary restraining order to prevent his transfer from the United States Naval Air Station at North Island, California, to the United States Naval Air Station at Atsugi, Japan. The motion for temporary restraining order was denied.

Plaintiff, a naval aviator, is now stationed at Atsugi where his duty consists primarily of flying jet aircraft from overhaul facilities at the naval air station, Atsugi, to the Philippine Islands for use in Vietnam.

Plaintiff, a 1955 graduate of the United States Naval Academy, is now a lieutenant commander in the regular navy. His commission, as do those of all officers, provides in part:

"This commission is to continue in force during the pleasure of the President * * *."

Plaintiff also was graduated from the United States Navy Post Graduate School at Monterey, California, which he attended for two years from 1960–1962, taking courses in naval engineering.

On January 14, 1966, plaintiff submitted his resignation, requesting separation in August of 1966, stating that his reason for resigning was to complete his legal education. No claim of hardship was submitted. The resignation was processed in accordance with SECNAV INSTRUCTION 1920.3D issued by the Secretary of the Navy on June 16, 1964,[1]

---

1. SECNAV INSTRUCTION 1920.3D (pertinent part).

"3. *Background.* Officers serve at the pleasure of the President and no terminal dates are established for their commissions. The Secretary of the Navy, by virtue of his authority to act for the President, establishes such criteria for the voluntary resignation of an officer's commission with release from active duty as are deemed necessary for the maintenance of a sound officer corps. A board of senior officers is established in the Bureau of Naval Personnel to assist the Chief of Naval Personnel and the Secretary of the Navy in determining the merits of individual resignations. The Chief of Naval Personnel shall forward for the Secretary of the Navy's consideration only those resignations which meet the criteria set forth in this Instruction or recommended exceptions thereto. The Chief of Naval Personnel shall take appropriate disapproval action on other

ALNAV 45–65 issued by the Secretary of the Navy on August 13, 1965,[2] and NAVOP 10 issued by the Chief of Naval Operations on August 13, 1965.[3]

In accordance with the foregoing directives, the Board of Officers assigned to consider plaintiff's resignation unanimously recommended that the resignation not be accepted. The Board based its determination upon the acute shortage of navy pilots and the fact that plaintiff had a "unique background of experience" in F8, A4, and F4 jet aircraft. The Chief of Naval Operations (Duties and Powers, 10 U.S.C.A. § 5081 (1962)), adopted the Board's recommendation and directed a letter to plaintiff, dated March 10, 1966, stating that action on his resignation would be deferred for a period of at least 12 months, and that he could re-

submit the resignation approximately four months prior to August 1967.

Since the issuance of the directives referred to, two additional directives relative to resignation of officers have been promulgated by the navy; the first, dated October 5, 1966, was issued by the Chief of Naval Operations, and the second, dated October 12, 1966, was issued by the Commandant of the Marine Corps. Both directives defer applications for resignation of certain officers. In both directives it is stated that the reason for deferment of resignation requests by certain officers is because there is a current shortage of officers in the aviation field.

Plaintiff's position is, since there has been no declaration of a "national emergency" by the President or the Congress, these various directives deferring resig-

resignations by direction of the Secretary of the Navy."

\* \* \* \* \*

"6. *Hardship Cases.* Resignation requests will be considered from officers who do not meet the foregoing criteria if they have genuine hardships, fully documented, more severe than those normally encountered by other service personnel, which are not of a temporary nature susceptible to relief by other means, and where approval of their resignations with release from active duty is the only means readily available for the alleviation of the hardship."

2. ALNAV 45–65 (pertinent part)
"1. IN ORDER TO ACHIEVE THE INCREASE IN PERSONNEL STRENGTH NECESSARY TO CARRY OUT ASSIGNED MISSIONS, EFFECTIVE IMMEDIATELY AND UNTIL FURTHER NOTICE THE CURRENT POLICY GOVERNING SEPARATION OF REGULAR OFFICERS AND ENLISTED PERSONNEL IS MODIFIED AS FOLLOWS:
A. REGULAR NAVY AND MARINE CORPS OFFICERS—APPROVAL OF REQUEST FOR VOLUNTARY RETIREMENT, RESIGNATION, REVERSION OF TEMPORARY OFFICERS TO PERMANENT WARRANT OR ENLISTED STATUS, AND TERMINATION OF TEMPORARY APPOINTMENT AND TRANSFER TO FLEET RESERVE WILL BE DEFERRED ON A SELECTIVE BASIS."

3. NAVOP 10
"*PART I—REGULAR NAVY OFFICERS*"
"A. PURSUANT TO REF A VOLUNTARY SEPARATIONS OF COMMISSIONED AND WARRANT OFFICERS WILL BE DEFERRED ON A SELECTIVE BASIS. SUBJECT TO NEEDS OF THE SERVICE, SELECTIVE DEFERRALS OF VOLUNTARY SEPARATIONS WILL BE GOVERNED BY THE FOLLOWING CRITERIA:"

\* \* \* \* \*

"2. APPROVAL OF VOLUNTARY RESIGNATIONS OF PERMANENT REGULAR NAVY OFFICERS (LESS THOSE COMMISSIONED FROM NROTC (REGULAR) PROGRAM WHO ARE COMPLETING THEIR INITIAL OBLIGATED ACTIVE SERVICE) WILL BE DEFERRED ON A SELECTIVE BASIS FOR PERIODS UP TO TWELVE MONTHS EXCEPT FOR REASON OF PERSONAL HARDSHIP."

\* \* \* \* \*

"B. BUPERS VOLUNTARY RETIREMENT ORDERS AND SECNAV RESIGNATION, REVERSION AND TERMINATION ORDERS, ISSUED PRIOR TO DATE OF REF A, WILL BE EXECUTED AS PRESENTLY WRITTEN. PENDING APPROVALS OF REQUESTS FOR VOLUNTARY RETIREMENT, RESIGNATION, REVERSION, AND TERMINATION WILL BE GOVERNED BY THE POLICY SET FORTH IN REF A AND THIS NAVOP."

nation of officers are beyond the constitutional power of the President or those officers delegated to act for him. Plaintiff contends that absent a statute enacted by Congress, the President, acting through the Secretary of the Navy, has no right to require compulsory service of an officer for the reason that the Congress has the sole right to determine who shall serve in the armed forces and in what manner, citing U.S.Const. art. I, § 8, clause 13; concurring opinion of Justice Jackson in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 644, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); United States v. Macintosh, 283 U.S. 605, 622, 51 S.Ct. 570, 75 L.Ed. 1302 (1931); Bertelsen v. Cooney, 213 F.2d 275, 277 (5th Cir. 1954).

Plaintiff does not and cannot rely upon the holdings in the cited cases, but places his reliance upon language contained in the opinions to the effect—

"While Congress cannot deprive the President of the command of the army and navy, only Congress can provide him an army or navy to command." Sawyer, supra, p. 644, 72 S.Ct. p. 874. "In express terms Congress is empowered 'to declare war,' which necessarily connotes the plenary power to wage war with all the force necessary to make it effective; and 'to raise * * * armies,' which necessarily connotes the like power to say who will serve in them and in what way." Macintosh, supra, p. 622, 51 S.Ct. p. 574. "It is for Congress to say when, who, to what extent, and how they shall be selected." Bertelsen, supra, p. 277.

In this connection, plaintiff requests the court to make a finding that there is no present national emergency and that none has been declared by the President or the Congress.

Defendant suggests that the Presidential Proclamation No. 2914 of December 19, 1950, 15 Fed.Reg. 9029, declaring a national emergency during the Korean conflict, is still in full force and effect. It is unnecessary to decide whether it is or is not. However, on August 10, 1964, the Congress passed Public Law 88–408, entitled, "JOINT RESOLUTION TO promote the maintenance of international peace and security in southeast Asia.", 78 Stat. 384 (1964),[4] whereby Congress

---

4. PUBLIC LAW 88–408; 78 STAT. 384

"Joint Resolution to promote the maintenance of international peace and security in southeast Asia.

WHEREAS naval units of the Communist regime in Vietnam, in violation of the principles of the Charter of the United Nations and of international law, have deliberately and repeatedly attacked United States naval vessels lawfully present in international waters, and have thereby created a serious threat to international peace; and

WHEREAS these attacks are part of a deliberate and systematic campaign of aggression that the Communist regime in North Vietnam has been waging against its neighbors and the nations joined with them in the collective defense of their freedom; and

WHEREAS the United States is assisting the peoples of southeast Asia to protect their freedom and has no territorial, military or political ambitions in that area, but desires only that these peoples should be left in peace to work out their own destinies in their own way:

Now, therefore, be it

Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the Congress approves and supports the determination of the President, as Commander in Chief, to take all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression.

Sec. 2. The United States regards as vital to its national interest and to world peace the maintenance of international peace and security in southeast Asia. Consonant with the Constitution of the United States and the Charter of the United Nations and in accordance with its obligations under the Southeast Asia Collective Defense Treaty, the United States is, therefore, prepared, as the President determines, to take all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom.

Sec. 3. This resolution shall expire when the President shall determine that the peace and security of the area is reasonably assured by international condi-

has expressly provided the President with the power to use our armed forces in the protection of South Vietnam from invasion by the North Vietnamese.

■ As said before, while it is not considered necessary to determine whether the President has declared a national emergency or whether a national emergency exists, it would be totally unrealistic to find that there is not now an emergency as a result of the Vietnam conflict. The court surely can take judicial knowledge of the fact that we have committed a large joint military force in Vietnam, and furthermore, that there must also be a large military force in the United States to provide relief for the military personnel in Vietnam.

In support of defendant's motion for a summary judgment there has been filed an affidavit of Samuel T. Orme, Captain, U. S. Navy, Director—Officer Distribution Division, Bureau of Naval Personnel, which states in part.

"That as of April 22, 1966, the navy had requirements for approximately 16,700 aviators but only had about 14,900; that, as of July 1, 1966, the Navy had selectively deferred the acceptance of resignations of 665 officers; that of this number 185 are pilots; and the acceptance of the resignations of the 185 pilots selectively retained under the current deferment policy would have had a critical adverse effect on the capability on the U. S. Navy to carry out its assigned mission in southeast Asia."

Historically, it has been universally accepted that an officer of the armed forces of the United States cannot leave the service until his resignation is accepted by the President. The Bureau of Naval Personnel Manual, issued July 1, 1959, contains the following provision: (A similar provision was contained in changes to the manual in 1957, and similar language was contained in predecessor publications)

"C–10326. RESIGNATIONS OF OFFICERS—GENERAL INFORMATION

(1) Officers of the U. S. Navy and Naval Reserve retain their commissions at the pleasure of the President and no terminal dates are established for their commissions. The Secretary of the Navy, by virtue of his authority to act for the President prescribes, by appropriate instructions, such criteria for the voluntary termination of an officer's status as are deemed necessary in the light of current service requirements and the need for maintaining a sound officer corps."

Article 85 of the Uniform Code of Military Justice, 10 U.S.C.A. § 885 (1956), provides in part as follows:

"(b) Any commissioned officer of the armed forces who, after tender of his resignation and before notice of its acceptance, quits his post or proper duties without leave and with intent to remain away therefrom permanently is guilty of desertion." (This provision was first enacted in 1861)

In Mimmack v. United States, 97 U.S. 426, 24 L.Ed. 1067 (1878), the court, in passing upon the question of whether a resignation of an army officer could be withdrawn when once accepted, made the following observation:

"Nothing short of a written resignation to the President or the proper Executive Department, by a commissioned officer of the army, navy or marine corps, and the acceptance of the same duly notified to the incumbent of the office, in the customary mode, will of itself create a vacancy in such an office, or prevent the incumbent, if the President consents, from withdrawing the proposed resignation; in which event the rights, privileges, duties and obligations of the officer remain just as if the resignation had never been tendered.

"Prior to notice that the resignation tendered has been accepted by the

tions created by action of the United Nations or otherwise, except that it may be

terminated earlier by concurrent resolution of the Congress."

President, the officer in such a case may not without leave quit his post or proper duties, nor is he deprived of any of the rights or privileges conferred and enjoyed by virtue of his appointment and commission."

On December 1, 1964, the Secretary of the Navy, for the President, promulgated changes to U. S. Navy Regulations 1948, which provide in part in Article 1201 entitled "REGULATORY PUBLICATIONS FOR THE DEPARTMENT OF THE NAVY":

"(c) 'General Orders' of the Secretary of the Navy, letters and issuances in the Navy Directives System addressed to the Department of the Navy and signed by the Secretary of the Navy, and general messages addressed to the Department of the Navy and originated by the Secretary of the Navy."

\* \* \* \* \* \*

"(f) Manuals and similar publications, including those within the Navy and Marine Corps Directives Systems, issued by the chiefs of bureaus and offices, the Comptroller of the Navy, the Judge Advocate General, and the Commandant of the Marine Corps, and approved by the Secretary of the Navy.

"2. The regulations, orders, and instructions contained in the said sources are binding on all persons in the Department of the Navy."

By 5 U.S.C.A. § 22, as it existed as of January 1966, the Congress provided "The head of each department is authorized to prescribe regulations not inconsistent with law, for the government of his department \* \* \*", and by 10 U.S.C.A. § 133 (1962) the Secretary of Defense is authorized to perform his functions through such persons in his department as he may designate. And, by 10 U.S.C.A. § 5031 (1964), the Congress has provided that the Secretary of the Navy is the head of the Department of the Navy and "He shall administer the Department of the Navy under the direction, authority and control of the Secretary of Defense."

The Congress, by 3 U.S.C.A. § 301 (1951), authorized the President to designate and empower the head of any department or agency in the executive branch to perform without approval, ratification or other action by the President "(1) any function which is vested in the President by law." (See Exec. Order No. 10621, Sec. 2(a), 20 Fed.Reg. 4759 (1955), delegating authority to approve Navy Regulations.)

■ Congress, by virtue of U.S. CONST, art. I, § 8, and the President, by virtue of U.S.Const. art. II, § 2, have correlative powers to promulgate rules for the government and regulation of the armed forces. Cafeteria and Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 890, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

■ While it is true that Congress has not legislated as to the resignation of officers, the Secretary of the Navy has acted. Whether the Secretary of the Navy acted by virtue of delegation of authority from the President, the Secretary of Defense, or from the Congress makes little difference so long as his directives are not contrary to law. Regulations issued by heads of executive departments under 5 U.S.C.A. § 22, are presumed valid. Boske v. Comingore, 177 U.S. 459, 470, 20 S.Ct. 701, 44 L.Ed. 846 (1900); Reed v. Franke, 297 F.2d 17, 25 (1961), supra; Edwards v. Madigan, 281 F.2d 73 (9th Cir. 1960). In the *Reed* case, passing upon the validity of a navy regulation promulgated by the Secretary of the Navy, the court stated:

"The burden of showing invalidity is a very heavy one \* \* \*"

No issue is raised by plaintiff as to the authenticity or the invalidity of any of the directives or regulations heretofore cited by reason of any formal pre-requisites; so, therefore, the directives and regulations relative to the resignation of officers must be presumed authentic and must be considered valid if they are not prohibited by the United States Constitution or by law.

In 1956, 10 U.S.C.A. §§ 5401 and 5402, Congress limited the number of enlisted men in the navy and marine corps, and, by 10 U.S.C.A. § 5403 (1956), the strength of officer personnel was set at 7 per cent of the enlisted personnel on active duty. The Congress has suspended the application of the foregoing statutes and any restrictions on the strength of any of the components of the armed forces until July 1, 1967. See note to 10 U.S.C.A. § 3201, (1966) pocket supplement.

We know that pursuant to the Universal Military Training Act, enlisted personnel have been and are being drafted at an average rate of in excess of thirty thousand per month. We know that to train the new personnel and to provide for their support in the military field there must be an enlarged officer corps. This corps and the whole military build-up can only be maintained by the executive branch by exercise of the right and power to control the length of time that an officer is required to serve. Congress has abstained from acting in this field for the apparent reason that, traditionally, the executive branch has acted and controlled the right of a regular officer to resign, and the executive power in this regard is not restricted except as Congress has provided by statute, giving officers a right to voluntarily retire under certain conditions and to be involuntarily retired under certain conditions. 10 U.S.C.A. § 6321, et seq.

Common sense would dictate that to allow officers to resign at will during a period of military build-up such as now exists, could seriously impair our military effectiveness.

██ Lastly, but not germane to the issue herein, involuntary servitude has never been construed as pertaining to the military service. That term in the Thirteenth Amendment includes only those forms of labor such as peonage. Butler v. Perry, 240 U.S. 328, 332, 36 S.Ct. 258, 60 L.Ed. 672 (1916); Robertson v. Baldwin, 165 U.S. 275, 282, 17 S.Ct. 326, 41 L.Ed. 715 (1897); Howze v. United States, 272 F.2d 146, 148 (9th Cir. 1959).

██ From the foregoing it appears that the various directives pursuant to which plaintiff's resignation was deferred, were issued pursuant to lawful delegated authority, and that they are not contrary to law nor prohibited by the Constitution.

██ It further appears that the Chief of Naval Operations acted within the scope of the directives and within the scope of his authority in deferring plaintiff's resignation.

Therefore, plaintiff's motion for a summary judgment is denied, and defendant's motion for a summary judgment is granted.

Counsel for defendant shall prepare, serve, and lodge a judgment in accordance herewith.